[No. 200,081-9.   En Banc.]
Argued May 17, 2005.     Decided August 18, 2005.

*In the Matter of the Disciplinary Proceeding Against* DONALD B. KRONENBERG, *an Attorney at Law.*

---

*Donald B. Kronenberg*, pro se.
*Arthur E. Ortiz* and *Gregory M. Miller*, for petitioner.
*Joanne S. Abelson*, for the Bar Association.

¶1 CHAMBERS, J. — The Washington State Bar Association (WSBA) filed a three-count formal complaint against Donald B. Kronenberg, alleging that he (1) bribed and tampered with a witness, (2) deceived prosecutors, and (3) is unfit to practice law. A hearing officer found that the WSBA had proved all counts and recommended disbarment, a decision the Disciplinary Board (Board) affirmed. We affirm the Board and now disbar Kronenberg.

## FACTS AND PROCEDURAL HISTORY

¶2 Harold Cotton was charged with three counts of felony rape of a child. In March 1996, Cotton hired Kronenberg to represent him through trial. The victim in the case, J.D., was 14 years old at the time of the alleged offenses and was the State's principal witness against Cotton. As of July 1996, J.D. had been interviewed by law enforcement authorities about the case and subpoenaed to trial, and intended to testify at Cotton's trial. Prior to the commencement of the trial, however, Kronenberg met with J.D. and offered him money in exchange for not appearing in court. Kronenberg couched the discussion in terms of "settling" a potential civil claim, but he made clear at all times that J.D. would have to leave the state and avoid testifying in the criminal case as a part of the "settlement." J.D. was receptive to Kronenberg's proposal. Kronenberg made a written notation at the time that J.D. would be willing to leave the state "right before court." Report of Proceedings at 972.

¶3 During the two weeks that followed, J.D. and Kronenberg finalized an agreement under which J.D. would leave town and not testify against Cotton in exchange for $6,000, including a one-way plane ticket to Tulsa, Oklahoma. The $6,000 would be paid in two $3,000 installments,

with the second installment conditioned upon not appearing for trial. The second installment was never paid.

¶4 Kronenberg authored a document to memorialize the agreement.[1] The agreement contained a confidentiality and

---

[1] The agreement reads in its entirety:

RECEIPT, SETTLEMENT, RELEASE AND NON-DISCLOSURE AGREEMENT

I, [J.D.] for the sole consideration of Six Thousand Dollars ($6,000.00), the sufficiency of which is hereby acknowledged, release and forever discharge Harold Jessie Cotton and his successors, underwriters, insurers, agents and assigns, (none of whom admit any liability to me, but each expressly denying all liability), from any and all claims, demands, damages, actions, causes of action, or suits of any kind or nature whatsoever, and particularly for any and all injury, loss or damage sustained or alleged to have resulted from and which was the underlying basis for a criminal prosecution commenced under King County Superior Cause Number 96-1-01164-5. This Agreement is expressly intended to apply to and forever release all claims, civil or otherwise, past, present or future, which can or may ever be asserted by me, my heirs or beneficiaries.

I now acknowledge the receipt and sufficiency of the sum of Three Thousand Dollars ($3,000.00) and agree to accept and allow Harold Jessie Cotton to pay to me a second installment payment in the amount of Three Thousand Dollars ($3,000.00), on or before ninety (90) days after the date of my signing this Agreement. In the event this second sum is not paid to me this Agreement shall have no force or effect, and I will be fully entitled to retain the initial Three Thousand Dollars ($3,000.00) paid to me on this date.

I have completely read, fully understood, and voluntarily accept all of the terms and conditions of this Agreement, which are for the purpose of making a full and final compromise, adjustment and settlement of any and all claims, disputed or otherwise, on account of the matters alleged to have occurred between myself and Harold Jessie Cotton as more fully described in King County Superior Court Cause Number 96-1-01164-5. The express purpose of this Agreement is to forever preclude any further or additional claims arising out of or in any way connected with the above described matter. Nobody has threatened me or in any way coerced me into signing this Agreement. I am signing this Agreement on my own free will, and am knowingly doing so without conferring with or engaging the services of an attorney of my own choosing to review and advise me on this Agreement. This Agreement is unconditional and there are no other terms or conditions not specified herein.

I understand and acknowledge that damages may result from a breach of the confidentiality and nondisclosure provision of this Agreement, and that these damages cannot be measured with certainty. Accordingly, unless compelled in a court of law, I agree to neither discuss nor disclose to anyone at anytime the existence of this Agreement or of the alleged facts which form the basis of this Agreement. If I am requested to disclose confidential facts in connection with any court action, I shall first notify Harold Jessie Cotton or his attorney as soon as the request is made. In the event consent to disclose is not given to me by Harold Jessie Cotton or his attorney, they shall take appropriate steps to resist disclosure and I agree to fully cooperate in their doing so.

Ex. 11 (Opening Br. of Appellant, App. C).

nondisclosure provision, which purported to prohibit J.D. from disclosing "to anyone at anytime the existence of [the] Agreement or of the alleged facts [that] form[ed] the basis of [the] Agreement." Ex. 11, at 2 (Opening Br. of Appellant, App. C). Kronenberg initially claimed that he was entitled to pay J.D. for not testifying against Cotton but later claimed that he did not intend to preclude J.D. from speaking to prosecutors.

¶5 On July 16, 1996, Cotton met Kronenberg in the parking garage of Kronenberg's office and gave him $3,000 in cash. Kronenberg did not put the money in his trust account. The next day, Kronenberg used part of the initial $3,000 to purchase a one-way plane ticket to Tulsa. He then gave J.D. the plane ticket and the remaining cash, and offered to drive J.D. to the airport—an offer that J.D. refused. At an omnibus hearing two days later, the court ordered Kronenberg to disclose information about J.D. to the extent he was aware of J.D.'s whereabouts. Kronenberg left the hearing without providing any information to prosecutors and later instructed his secretary not to write down anything she learned about J.D.'s whereabouts.

¶6 On July 24, 1996, Kronenberg met with prosecutors and told them that they had to dismiss the case because they did not have a victim. Kronenberg told them that he believed that J.D. had left for Oklahoma but was vague when pressed for details and told them that the source of his knowledge was his private investigator. Kronenberg failed to tell prosecutors that he had met with J.D. in Seattle the previous week or that he had hand-delivered to J.D. a one-way ticket to Tulsa.

¶7 J.D. placed a call to Kronenberg and told Kronenberg that he was still in Seattle. Pursuant to a court order, the call was recorded. Kronenberg again encouraged J.D. to leave town, saying: "Just get a . . . buy a plane ticket and go!" WSBA Ex. 18, at 6. Kronenberg did not report the conversation or his new knowledge of J.D.'s whereabouts to prosecutors or to the court.

¶8 On July 26, 1996, prosecutors moved to disqualify Kronenberg from representing Cotton because of his role in attempting to procure J.D.'s absence. There is evidence that Kronenberg then admitted to prosecutors that he had paid J.D. to get out of town and that his only error in judgment had been purchasing the plane ticket himself. The court granted the motion to disqualify on July 29, 1996.

¶9 The WSBA filed a three-count formal complaint against Kronenberg on October 3, 2000. The complaint alleged that Kronenberg (1) violated RPCs 8.4(a)-(d) by bribing and tampering with a witness, (2) violated RPC 8.4(c) by deceiving prosecutors regarding his role in procuring J.D.'s absence, and (3) was unfit to practice law on the basis of counts 1 and 2. A five day hearing was held in June 2003. The hearing officer determined that the WSBA had proved all three counts and recommended disbarment. The Board affirmed by a vote of 10-1 and this appeal followed.

## DISCUSSION

¶10 This court has plenary power over and holds the ultimate responsibility for lawyer discipline. *In re Disciplinary Proceeding Against Romero*, 152 Wn.2d 124, 132, 94 P.3d 939 (2004). Certain responsibilities have been delegated to the WSBA. *In re Disciplinary Proceeding Against McKean*, 148 Wn.2d 849, 861, 64 P.3d 1226 (2003). Procedurally, findings of fact, conclusions of law, and recommended sanctions are made to the Board by a hearing officer, who functions as the initial investigator and fact finder. *Id*. After reviewing the hearing officer's decision, the Board enters an order, which may be appealed to this court. *Id*.; ELC 12.3.

¶11 The hearing officer made a factual finding that Kronenberg intended to bribe J.D. by offering him money and a plane ticket in exchange for leaving the state and not testifying. The hearing officer explicitly found that the written settlement agreement was "a ruse to conceal the bribery," Clerks Papers (CP) at 71, and that "[t]he entire

'civil' presentation was false evidence," which was concocted by Kronenberg as "a cover for his bribery plan." CP at 79.

¶12 Kronenberg argues that the findings are not supported by the record. An attorney challenging factual findings on appeal must do more than "argu[e] his version of the facts while ignoring testimony by other witnesses that supports each finding." *In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 814, 72 P.3d 1067 (2003).[2] The attorney must "present argument to the court why specific findings of fact 'are not supported by the evidence and . . . cite to the record to support that argument.' " *In re Disciplinary Proceeding Against Haskell*, 136 Wn.2d 300, 311, 962 P.2d 813 (1998) (quoting *In re Estate of Lint*, 135 Wn.2d 518, 532, 957 P.2d 755 (1998)).[3]

¶13 Kronenberg does not present argument about why specific findings are unsupported by the evidence. The WSBA, however, cites a significant portion of the record in support of the hearing officer's finding that Kronenberg intended to bribe or tamper with J.D. and that the civil settlement defense was a mere pretense. *See* Br. of Resp't at 23-25. While much of this evidence is circumstantial, circumstantial evidence is as good as direct evidence for these purposes. *Rogers Potato Serv., L.L.C. v. Countrywide Potato, L.L.C.*, 152 Wn.2d 387, 391, 97 P.3d 745 (2004) (per curiam) (citing *State v. Gosby*, 85 Wn.2d 758, 766-67, 539

---

[2] The WSBA urges us to adopt a "waiver rule" under which an attorney waives his or her right to contest the factual findings of the hearing officer if those findings are not contested before the Board. We decline to create such a rule. Unlike review by this State's intermediate appellate courts, review by the Board is automatic in cases where the recommended sanction is disbarment. It is not occasioned only by an appellant's appeal. *See* ELC 11.2(b)(1). Thus, although one of the Board's functions is somewhat analogous to that of an intermediate appellate court, we decline to impose Washington's appellate court procedures on the disciplinary process. Additionally, even when reviewing the work of an appellate court, we have reserved the right to exercise our inherent power to reach any issue brought to our attention. *See, e.g.,* RAP 2.5(a) (the "court *may* refuse to review any claim of error which was not raised" in the court below (emphasis added)).

[3] The WSBA moved to strike portions of Kronenberg's brief that are not supported by the record. The allegedly improper statements have no relevance to the issues necessary to resolve this case, and we deny the motion to strike them as irrelevant to our disposition of this matter.

P.2d 680 (1975)); *In re Disciplinary Proceeding Against Cohen*, 149 Wn.2d 323, 332-33, 67 P.3d 1086 (2003).

¶14 In fact, rather than deny the conduct, Kronenberg's central argument is that paying J.D. for his silence was justified because he was settling a potential civil claim that J.D. might bring against Cotton. Indeed, Kronenberg argues that he had an ethical duty to his client to negotiate a settlement of any future potential civil claims by the victim. The WSBA points out that J.D. never asserted a civil claim and that he testified that he never had any intention of doing so.

■ ¶15 More importantly, Kronenberg confuses a release of claims with a confidentiality agreement. A release of potential civil claims and a confidentiality agreement are distinctly different and have different purposes. A release of claims is a contract whereby one party pays consideration to another in exchange for the latter's agreement never to bring a civil action against the former on the claims at issue. Kronenberg could have accomplished his claimed goal of protecting Cotton from future civil claims by securing a release from J.D. A confidentiality agreement is a contract wherein one party bargains for the silence of another. In a system of open justice, confidentiality agreements are not encouraged.[4]

¶16 The hearing officer found, and we agree, that Kronenberg's sole motivation in securing the civil settlement was to buy J.D.'s silence in the criminal prosecution. We conclude that the civil settlement was a ruse to bribe J.D. not to testify at Cotton's criminal trial and was devised to conceal the bribe itself.

---

[4] *See, e.g.,* CONST. art. I, § 10 ("[j]ustice in all cases shall be administered openly . . . ."); *Zuver v. Airtouch Communications, Inc.*, 153 Wn.2d 293, 103 P.3d 753 (2004) (confidentiality agreement in employment contract unconscionable where it hampers employee's ability to prove discrimination); *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004) ("Proceedings cloaked in secrecy foster mistrust and, potentially, misuse of power."); Laurie Kratky Dore, *Secrecy by Consent: The Use and Limits of Confidentiality in the Pursuit of Settlement*, 74 NOTRE DAME L. REV. 283, 307 (1999) ("courts should . . . oppose even consensual attempts by litigants to shield information or documents that are of public interest or that are relevant to public health and safety").

STANDARDS FOR ADMITTING EVIDENCE

¶17 In attorney discipline cases, misconduct must be proved by a clear preponderance of the evidence. *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 58, 93 P.3d 166 (2004). This level of proof requires " 'greater certainty than "simple preponderance" but not to the extent required under "beyond a reasonable doubt" ' " standard. *Id.* (quoting *In re Disciplinary Proceeding Against Allotta*, 109 Wn.2d 787, 792, 748 P.2d 628 (1988)). Despite this heightened level of proof, "[h]earing officers should be guided in their evidentiary and procedural rulings by the principle that disciplinary proceedings are neither civil nor criminal" and are undertaken to determine if a lawyer's conduct will impact his or her ability to practice law. ELC 10.14(a). "[E]vidence, including hearsay evidence, is admissible if *in the hearing officer's judgment* it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." ELC 10-.14(d)(1) (emphasis added).

*Hearsay Evidence*

¶18 Kronenberg asserts that the admission of hearsay evidence under ELC 10.14(d)(1) violates his right to procedural due process. This argument assumes that hearsay evidence is intrinsically unreliable, an assumption we have previously rejected. *See Chmela v. Dep't of Motor Vehicles*, 88 Wn.2d 385, 561 P.2d 1085 (1977). In *Chmela*, we held that the admission of hearsay evidence in an administrative proceeding did not violate due process. *Id.* at 392 ("[h]earsay evidence is not necessarily untrustworthy"). Due process is satisfied by the " 'best evidence *reasonably* obtainable, having due regard for its necessity, availability and trustworthiness.' " *Id.* (quoting former WAC 1-08-520, *repealed by* Wash. St. Reg. 91-10-010 (May 20, 1991)). Similarly, we find that the standard set forth in ELC 10.14(d)(1) satisfies due process.

¶19 Kronenberg attempts to buttress his due process claim by arguing that the sheer volume of allegedly erro-

neously admitted hearsay evidence prevents us from engaging in a harmless error analysis. He contends that the hearing was "swamped" and "riddled" with "torrents" and "tidal waves" of unreliable hearsay. We agree with Kronenberg that the hearing officer tended to allow everything offered to be admitted, often without ruling on its admissibility, a procedure we do not endorse.

¶20 The WSBA contends, however, that even if some of the disputed evidence was erroneously admitted, any error was harmless, even under strict rules of evidence, because each of the out-of-court declarants testified and was subject to cross-examination.[5] *See State v. Bargas*, 52 Wn. App. 700, 704-05, 763 P.2d 470 (1988) (no prejudicial error in admitting hearsay when declarant testified at trial). Because all of the facts supported by the disputed evidence were also established by other evidence, we conclude any error in their admission was harmless. *See Feldmiller v. Olson*, 75 Wn.2d 322, 324-25, 450 P.2d 816 (1969) ("Error in the admission of evidence is without prejudice when the same facts are established by other evidence.").

*Polygraph Evidence*

¶21 Kronenberg also argues that the hearing officer's erroneous consideration of polygraph reports tainted the hearing. The WSBA concedes that polygraph evidence was inadmissible. The WSBA argues, however, that because the hearing officer did not use the reports as an aid in determining whether the examinees were credible in reaching his decision, any error in admitting the reports was harmless.

¶22 Because they are not recognized as reliable evidence, the results of polygraph tests are not admissible

---

[5] The initially admitted written notes of prosecutor Duane Evans were not subject to cross-examination. However, this evidence was disregarded by the hearing officer who noted that the evidence was admissible insofar as it also contained Kronenberg's adoptive admissions. *See* ER 801(d)(2). The hearing officer specifically stated that he would not consider any comments or observations made by Evans because Evans was not available for cross-examination.

absent stipulation from both parties. *State v. Thomas,* 150 Wn.2d 821, 860, 83 P.3d 970 (2004) (citing *State v. Renfro,* 96 Wn.2d 902, 905, 639 P.2d 737 (1982)). In his written decision, the hearing officer stated that he did not consider the polygraph *results* at all. This was consistent with his general approach of broadly accepting evidence, often without determining admissibility. With regard to the polygraph reports, this approach was inappropriate, especially given the gravity of the allegations and the heightened burden of proof. Furthermore, the admission of these polygraph reports failed to meet the test for admissibility under ELC 10.14(d)(1). In the context of this case, the reports cannot be said to have been "the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." ELC 10.14(d)(1). The polygraph reports should not have been admitted.[6] However, because we find overwhelming evidence to support the hearing officer's other findings, their admission was harmless.

APPROPRIATE SANCTION

¶23 In determining appropriate attorney disciplinary sanctions, the court engages in a two-step process utilizing the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) (ABA STANDARDS). *See Cohen,* 149 Wn.2d at 338. First, the presumptive sanction is determined by considering the ethical duty violated, the lawyer's mental state, and the extent of the actual or potential harm caused by the misconduct. *Id.* Second, the court considers any aggravating or mitigating factors that may alter the presumptive sanction or affect the nature or length of the discipline to be imposed. *Id.*

¶24 Both the hearing officer and the Board recommended that Kronenberg be disbarred. This recommendation was based on ABA *Standards* standards 5.11(a) and (b), and

---

[6] We decline to create a categorical rule that the information contained in a polygraph report is never admissible. There may well be circumstances under which information contained in such reports may be admissible.

6.31(a),[7] and the presence of aggravating factors, including Kronenberg's prior discipline involving dishonesty, his dishonest or selfish motive, his pattern of misconduct, his false testimony at the disciplinary hearing, the vulnerability of his victim, his substantial experience in the practice of law, his indifference to making restitution, and his refusal to acknowledge the wrongful nature of his conduct.[8]

¶25 We have long held that disbarment is the appropriate sanction for witness tampering. *See In re Disciplinary Proceeding Against Stroh*, 97 Wn.2d 289, 644 P.2d 1161 (1982). In *Stroh*, we held that "[a]ttempting to tamper with a witness represents a flagrant disregard for the very principles upon which our legal system is grounded and renders an attorney unfit to practice law." *Id.* at 301. We reaffirm that principle here.

¶26 Kronenberg claims that the mitigating factor of delay should reduce his sanction. Kronenberg relies on *In re Disciplinary Proceeding Against Tasker*, 141 Wn.2d 557, 9 P.3d 822 (2000), in which this court held that a four year delay in filing disciplinary charges against an attorney undercut the WSBA's argument that the attorney was a threat to the public. *Tasker*, 141 Wn.2d at 567-69. Kronenberg's reliance on *Tasker* is misplaced. In *Tasker*, we recognized that the lawyer "made the most of the delay by demonstrating his willingness and ability to clean up his

---

[7] ABA *Standards* std. 5.11(a) indicates that disbarment is generally appropriate when a lawyer intentionally interferes with the administration of justice. ABA *Standards* std. 5.11(b) indicates that disbarment is generally appropriate when a lawyer engages in intentional conduct involving dishonesty, fraud, deceit, or misrepresentation. ABA *Standards* std. 6.31(a) indicates that disbarment is generally appropriate when a lawyer intentionally tampers with a witness and causes potentially significant interference with the outcome of a legal proceeding.

[8] Though the parties did not brief or argue the issue, we question whether refusal to acknowledge the wrongful nature of one's conduct is appropriately considered an aggravating factor. We are not persuaded that a lawyer's continuing to assert on appeal that the alleged acts did not occur should have that assertion used against him or her. In this case, however, Kronenberg does not deny that he engaged in the activity in question. Instead, he urges us to find that the activity was not wrongful.

act." *Tasker*, 141 Wn.2d at 568. Kronenberg has made no such demonstration.

¶27 There may be circumstances where the WSBA's failure to initiate disciplinary action after an investigation misleads a lawyer to believe that the conduct complained of is ethical. Such a delay might be a mitigating factor where the WSBA later seeks to bring additional counts for later conduct that an earlier disciplinary action would have prevented. Those circumstances do not exist here. Kronenberg has not shown that the delay in his case was inexcusable or undue, nor has he shown that the delay has prejudiced him in any way. *See In re Disciplinary Proceeding Against Anschell*, 149 Wn.2d 484, 519-20, 69 P.3d 844 (2003); *In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 820-21, 72 P.3d 1067 (2003). Therefore, the mitigating factor of delay has no bearing on the nature of the sanction in this case.[9]

## CONCLUSION

¶28 Kronenberg gave a rape victim $3,000 and a one-way ticket to Oklahoma shortly before his client's trial so that the victim would leave town and not testify against his client. He then violated a court order by failing to divulge to prosecutors information related to the witness' where-abouts. He also lied to prosecutors about his role in procur-

---

[9] Kronenberg also argues (1) that the WSBA should be precluded from seeking disbarment because it did not move for interim suspension prior to a hearing, (2) that disbarment is inappropriate because he has not reoffended, and (3) that he should not be disbarred because he was not criminally prosecuted. All of these claims are without merit.

We have never held that an interim suspension is a prerequisite to disbarment and we decline to do so here. Additionally, "[e]nding misconduct does not erase ... that misconduct which has already occurred. Even where an attorney has been rehabilitated prior to the imposition of discipline, 'the legal system itself has not been redeemed.'" *In re Disciplinary Proceeding Against Dann*, 136 Wn.2d 67, 83-84, 960 P.2d 416 (1998) (quoting *In re Disciplinary Proceeding Against Kennedy*, 97 Wn.2d 719, 723, 649 P.2d 110 (1982)). Finally, and contrary to Kronenberg's claim, the absence of a criminal prosecution is irrelevant to lawyer discipline because the interest sought to be protected is different. The lawyer's "duty to the public is breached regardless of whether a criminal charge has been brought against the lawyer." ABA STANDARDS std. 5.11 cmt.

ing the witness' absence. The hearing officer made a factual finding that Kronenberg intended to bribe the witness and deceive prosecutors, and that he was, therefore, unfit to practice law. The Board affirmed the hearing officer's decision. We affirm the Board and disbar Kronenberg.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

Reconsideration denied September 30, 2006.