239 P.3d 1066 (2010)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Richard Dale SHEPARD, an attorney at law.
No. 200,720-1.
Supreme Court of Washington, En Banc.
Argued May 6, 2010.
Decided September 9, 2010.
*1067 Brett Andrews Purtzer, Tacoma, for Petitioner.
Kevin M. Bank, Washington State Bar Association, for Respondent.
CHAMBERS, J.
¶ 1 The Washington State Bar Association Disciplinary Board (Board) unanimously recommended Richard Dale Shepard be suspended from the practice of law for two years after it found Shepard had committed four counts of attorney misconduct. The misconduct stemmed from Shepard's participation in a living trust scam targeted at seniors. Shepard argues that a two year suspension is too harsh and urges this court to adopt the hearing officer's recommendation of a six-month suspension. We conclude that a two-year suspension is an appropriate sanction for Shepard's misconduct.

FACTS AND PROCEDURAL HISTORY
¶ 2 Shepard was a solo practitioner in Tacoma who focused about a third of his practice on basic estate planning.[1] In 2003, he *1068 was contacted by Steven Cuccia, President of Coranda Living Trust Services (Coranda), about entering into a business arrangement. Cuccia intended to sell living trusts to seniors in Washington and wanted Shepard to be available to provide legal advice to his customers. Under the proposed agreement, clients who purchased a Coranda Living Trust Package (CLTP) from Cuccia would be referred to Shepard for legal services relating to those trusts. Cuccia would independently market and sell the trusts and would arrange to have each purchaser sign a fee agreement with Shepard. The fee agreement required clients to pay Shepard a flat fee of $200 in exchange for his agreement to independently review and make recommendations regarding each client's estate planning needs. During the meeting, Cuccia informed Shepard that he was not a lawyer, but told him he was a "certified estate planner." Clerk's Papers (CP) at 119. Cuccia did not mention that he had been previously convicted in California for selling fraudulent insurance products to seniors. Shepard agreed to the proposal.
¶ 3 After affiliating with Shepard, Cuccia began selling living trusts to seniors. Cuccia visited the homes of prospective clients and gave a presentation about the benefits of using a living trust over other estate planning tools. Many of the elderly couples visited by Cuccia did not understand the differences between various estate planning options, and much of the information Cuccia provided them was either inaccurate or misleading. In particular, Cuccia exaggerated the costs and difficulty of probating an estate in Washington. Many clients were sold trusts that they did not need without being fully informed on how the living trusts they were purchasing worked. Most clients would have been better served by executing simple wills and advance medical directives rather than the living trusts they purchased from Cuccia. Shepard never accompanied Cuccia on these sales visits. He did not discuss other estate planning options with prospective clients or review their various financial situations before they agreed to purchase the CLTP from Cuccia.
¶ 4 As part of Cuccia's sales pitch, prospective clients were told that an attorney would review the estate planning documents and were presented with an attorney-client fee agreement whereby the clients retained Shepard and agreed to pay him $200 for his services. Among other things, the fee agreement provided:
1. SCOPE OF SERVICE. Client(s) retain Attorney to provide the following legal services:
(a) Review and Consultations. Independent review of Client(s) estate planning needs to make recommendations regarding appropriate planning tools and supporting documents. Includes a personal telephone consultation to verify key information and provide answers to Client(s) legal questions.
(b) Document and Asset Review. Review available financial and real estate documents for proper title designation. Order and supervise drafting of all plan documents, review final documents, and issue opinion letter with plan documents.
Ass'n Ex. 202, at 00020.[2]
¶ 5 Shepard did not draft or produce the trust packages sold by Cuccia. Both the CLTP and Shepard's fee agreement were generated by a third party, Attorney's Trust Document Service, Inc. (ATDS), a contract paralegal service that provides legal forms to attorneys. Shepard discussed the CLTP with ATDS and suggested certain changes. Upon agreement with Cuccia to purchase a CLTP, clients were asked to fill out a questionnaire that included the client's assets and the names, addresses, and ages of intended beneficiaries. The questionnaire was then sent to ATDS which would generate the trust documents and a short table summarizing *1069 the client's answers on the questionnaire. These documents were forwarded to Shepard, but he did not carefully review them.[3] Shepard simply called his clients to verify the information provided in the questionnaire was accurate. Once the information was verified, the trust packages were forwarded to Cuccia who delivered them, along with a form letter written by Shepard explaining how to execute the trusts, to the clients for completion and execution. When the trusts were finally delivered, Shepard considered his job complete and never followed up with any of his clients to ensure that the trust documents were executed correctly.
¶ 6 Shepard did not provide the services promised in his fee agreement. He never discussed with his clients their estate planning needs and never discussed with them the advisability of entering into a living trust. He did not review their assets to determine an appropriate estate planning strategy. Though he did speak with his clients after they had already purchased the CLTP from Cuccia, these conversations were very brief and were limited to verifying the information provided on the questionnaire. Shepard never discussed the financial condition of his clients, the size of their estates, or other simpler estate planning options available to his clients. During the brief telephone calls he did make, Shepard never disclosed that he had an ongoing business relationship with Cuccia and Coranda and that this might give rise to a conflict of interest. In all, Shepard represented over 70 people or couples and received $200 from Cuccia for each one.
¶ 7 Although many of the purchasers of the CLTP were couples, Shepard often only spoke to one spouse over the phone. In some cases, Shepard made notes during the calls about concerns he had regarding the competency of clients. In one instance, one of Shepard's clients, William Bishop, specifically notified Shepard that his wife, Lavera Bishop, was incompetent to execute a trust. Although Shepard's fee agreement stated that "an in-office consultation ... is required if undue influence or incapacity issues appear possible," Ass'n Ex. 202, at 000120, Shepard made no effort to investigate the accuracy of the information, nor did he require the Bishops to come to his office to speak with him. Mr. Bishop signed the trust documents for his wife using a previously executed power of attorney that specifically did not allow Mr. Bishop to revoke or change any estate planning or testamentary documents for Mrs. Bishop. Shepard did not discuss the prior power of attorney with the Bishops, and as a result the trusts they purchased and attempted to execute were legally invalid.
¶ 8 At some point in 2003, Shepard was introduced to Steven Cuccia's brother, Anthony Cuccia, an insurance agent. Steven Cuccia informed Shepard that Anthony would be working with him, offering insurance products to clients who purchased CLTPs. Steven and Anthony Cuccia, along with Steven's wife Michelle and two other individuals, intended to use the personal and financial information obtained through the sale of the CLTPs to sell annuities and reverse mortgages to clients through fraudulent means. Many clients who purchased the trust packages were pressured into purchasing these insurance products. Most of the insurance products purchased from the Cuccias were eventually canceled, and the premiums returned, but only after intervention by the office of the insurance commissioner (OIC).
¶ 9 Shepard became aware of possible problems with his business arrangement with Cuccia by at least March 2004, when he was contacted by Sharon Prendergast, the daughter of two of his clients. Prendergast was upset about the practices of Shepard and Cuccia, and informed Shepard that she believed her parents were not competent to execute the trust documents provided by Coranda because her mother had Alzheimer's disease and her father was bedridden. She was concerned that the documents they had signed were not executed properly, which turned out to be correct. She also informed Shepard that in addition to the CLTP her parent's had purchased, Cuccia had attempted *1070 to sell her parents both an annuity and a reverse mortgage. Shepard spoke with Cuccia about his conversation with Prendergast, but made no changes with regard to the way the trusts or insurance products were sold.
¶ 10 In December 2004, Shepard sent a letter to the Washington State Bar Association (Bar) requesting an informal opinion about possible RPC violations that an attorney might commit while performing "estate planning consultation services." Resp't Ex. R2. In the letter, Shepard presented a "hypothetical" situation that essentially outlined the practices of Cuccia and Coranda in selling the trust packages. Id. However, the hypothetical lawyer that Shepard created in the letter actually performed the services promised his clients. Id. Shepard opined that the hypothetical scenario he created would not raise ethical concerns for the lawyer, but nevertheless asked for an opinion from the Bar. Id. Shepard never received a response from the Bar.
¶ 11 In February 2005, Shepard was contacted by Victor Overholt, an investigator with OIC. OIC had received an anonymous letter expressing concern that Steven and Michelle Cuccia, along with two other individuals, were running a living trust mill. Overholt informed Shepard that OIC was investigating the Cuccias for their role in selling insurance products to seniors and told Shepard about Steven Cuccia's prior felony conviction in California. Despite this information, Shepard continued to accept clients referred to him through Coranda well into 2005. Overholt informed both the Bar and the attorney general's office about his concerns regarding the Cuccias, Coranda, and Shepard. The Bar began investigating Shepard's role in the scheme.
¶ 12 In response to the ongoing investigations, Shepard initiated efforts to mitigate problems with his conduct. On April 20, 2006, he sent a letter to his clients urging them to make an appointment with him to review their trust documents. The letter informed clients of the three separate investigations by OIC, the attorney general, and the Bar. Shepard explained that he had no reason to believe that anything "improper" occurred during the preparation of the trust documents, but that he was concerned that some of the trusts were not executed properly or were never received at all. On January 29, 2007, Shepard sent a follow-up letter to his clients again urging them to make an appointment to see him or another attorney of their choice to review the trust documents purchased from Coranda.
¶ 13 The Bar filed a formal complaint against Shepard alleging that Shepard committed five counts of attorney misconduct violating seven Rules of Professional Conduct (RPC).
¶ 14 A hearing was held. The hearing officer concluded that the Bar had proven counts one, three, and five by a clear preponderance of the evidence. Those counts alleged:
Count One
49. By failing to adequately explain to his clients the risks and benefits of living trusts versus other estate-planning options for their specific situation, Respondent violated RPC 1.3 and/or former RPC 1.4(a) and/or former RPC 1.4(b).[[4]]
Count Three
51. By entering into a continuing business relationship with Coranda where he would receive a set fee for each living trust sold by Coranda, without first obtaining informed consent from his clients to the fact that Respondent had a personal interest in maintaining a continuing business arrangement with Coranda, Respondent violated former RPC 1.7(b).
Count Five
53. By failing to make reasonable efforts to ensure that he and/or his firm had in effect measures giving reasonable assurance that the conduct of Coranda and/or Steve Cuccia was compatible with the professional obligation of a lawyer, Respondent violated former RPC 5.3(a).
CP at 69-70.
¶ 15 However, the hearing officer concluded that the Bar had failed to prove that Shepard had affiliated himself with a nonlawyer who gave legal advice as alleged in count *1071 two, or that Shepard had shared fees with Coranda as alleged in count four. Id. at 133. The hearing officer specifically stated in his findings of fact that:
94. I also do not find that Mr. Shepard aided in the unlawful practice of law. Mr. Cuccia was selling a trust package that had legal implications, but no authority has been cited by the association that this constitutes the unlawful practice of law.
Id. at 132. Using the American Bar Association's Standards for Imposing Lawyer Sanctions (1991 & Supp. 1992) (ABA Standards), the hearing officer concluded that the presumptive sanction for the violations was suspension. He then found that there were three aggravating factors:
(c) a pattern of misconduct;
(d) multiple offenses;
(i) substantial experience in the practice of law (Respondent was admitted in 1986).
CP at 136-37. The hearing officer also found six mitigating factors:
(a) absence of a prior disciplinary record;
(e) absence of a dishonest or selfish motive; (Charging a fee for service is not a dishonest or selfish motive);
(d) timely good faith effort to make restitution or rectify the consequences of misconduct;
(e) full and free disclosure to the disciplinary board or cooperative attitude toward proceedings;
(g) character or reputation;
(l) remorse.
Id. at 137. The hearing officer ultimately recommended that Shepard be suspended for six months.
¶ 16 A unanimous Board adopted all of the hearing officer's findings of fact, except for his conclusion in paragraph 94 that Shepard had not aided Cuccia in the unlawful practice of law. It concluded that the Bar had proven count two by a clear preponderance of the evidence. The Board also removed two of the mitigating factors found by the hearing officer, concluding that the record did not establish the absence of a dishonest or selfish motive or a full and free disclosure to the Board. The Board added one aggravating factor, finding that Shepard had taken advantage of vulnerable victims. It also determined that the presumptive sanction for count one was disbarment but ultimately decided that disbarment was not necessary to protect the public or educate other lawyers. The Board unanimously recommended that Shepard's license be suspended for two years.

STANDARD OF REVIEW
¶ 17 "A hearing officer makes findings of fact, conclusions of law, and recommendations to the Board." In re Disciplinary Proceeding Against Dornay, 160 Wash.2d 671, 680, 161 P.3d 333 (2007). The Board may then "adopt, modify, or reverse the hearing officer's findings, conclusions, or recommendations." Id. We give considerable weight to the Board's recommendation. In re Disciplinary Proceeding Against Kuvara, 149 Wash.2d 237, 246, 66 P.3d 1057 (2003). However, this "court bears the ultimate responsibility for lawyer discipline in Washington." In re Disciplinary Proceeding Against Cohen, 150 Wash.2d 744, 753, 82 P.3d 224 (2004). Findings of fact will be upheld if they are supported by a clear preponderance of the evidence. In re Kuvara, 149 Wash.2d at 246, 66 P.3d 1057. Conclusions of law are reviewed de novo. In re Dornay, 160 Wash.2d at 680, 161 P.3d 333.

ANALYSIS

Assisting in the Unauthorized Practice of Law[5]
¶ 18 Despite the hearing officer's conclusion (couched as a finding of fact) that Shepard had not aided in the unauthorized practice of law, the Board found that the Bar had proven by a clear preponderance of the evidence that he had. The Board concluded:
Mr. Cuccia practiced law by choosing living trust documents for customers. Respondent knew that Mr. Cuccia was not a lawyer and that he would recommend a living trust to the customers (Findings 9 *1072 and 33). Respondent also knew that Mr. Cuccia would give the clients Respondent's fee agreement. The clients believed the documents were effective because they were reviewed by a lawyer. (Finding 52)[.] Respondent aided Mr. Cuccia's unauthorized practice of law by agreeing to represent clients in these transactions and allowing his name and title to be used to add legitimacy to the sale.
Board Order at 7.
¶ 19 Former RPC 5.5(b) (2002) states that a lawyer shall not:
(b) Assist a person who is not a member of the Bar in the performance of activity that constitutes the unauthorized practice of law.
General Rule (GR) 24(a) defines the practice of law as "the application of legal principles and judgment with regard to the circumstances or objectives of another entity or person(s) which require the knowledge and skill of a person trained in the law." "`"[T]he selection and completion of form legal documents, or the drafting of such documents... constitutes the practice of law."'" Jones v. Allstate Ins. Co., 146 Wash.2d 291, 302, 45 P.3d 1068 (2002) (first alteration in original) (quoting State v. Hunt, 75 Wash.App. 795, 802, 880 P.2d 96 (1994) (quoting Wash. State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n, 91 Wash.2d 48, 55, 586 P.2d 870 (1978))). "`Also, when `one determines for the parties the kinds of legal documents they should execute to effect their purpose, such is the practice of law.''" Id. (quoting Hunt, 75 Wash.App. at 802, 880 P.2d 96 (quoting Hecomovich v. Nielsen, 10 Wash.App. 563, 571, 518 P.2d 1081 (1974))). However, there are several activities that nonlawyers are permitted to engage in even if those activities might be considered the practice of law. GR 24(b). One such activity is the "[s]ale of legal forms in any format." GR 24(b)(8).
¶ 20 Shepard argues that Cuccia was simply selling legal forms and that his actions were therefore authorized under GR 24. He points to In re Estate of Knowles, 135 Wash. App. 351, 364-65, 143 P.3d 864 (2006), where the Court of Appeals found that the completing of preprinted will forms for another person was not the practice of law. Knowles involved a will contest where the decedent's son had filled out a preprinted form will for his father and then inherited the bulk of the estate. Id. at 354-55, 143 P.3d 864. In answering whether the son had engaged in the practice of law, the court focused on the degree of control the son had over his father and the testamentary process at the time of the will's execution. Id. at 364, 143 P.3d 864. It found that there was no evidence that the son had done anything more than fill in the form and that this alone was not the practice of law. Id. The court noted that "a person begins to practice law by either directly or indirectly (selection of appropriate documents) giving advice" and that filling in the form did not rise to that level. Id. at 365, 143 P.3d 864.
¶ 21 Shepard compares his situation to Knowles and argues that he "was not controlled, nor bound, by what Mr. Cuccia was selling" and therefore, under Knowles, was not affiliated with someone engaged in the unauthorized practice of law. Br. of Appellant at 14. But the question presented is not whether Shepard was controlled by Cuccia. At issue is whether Cuccia engaged in the practice of law by directly or indirectly giving legal advice to his clients and whether Shepard assisted him. Unlike Knowles, Cuccia did not simply help purchasers of the CLTP fill in the blanks on a preprinted form. He presented his clients with information about the benefits of executing a living trust through Coranda and then selected the documents his clients should use when they ultimately agreed to purchase a trust package. See In re Knowles, 135 Wash.App. at 365, 143 P.3d 864. Knowles is easily distinguished.
¶ 22 In addition, Cuccia's actions went well beyond selling legal forms. He was not simply providing living trust documents that his clients had already decided to purchase. He was marketing an estate planning package by providing false and misleading information about the dangers of probate in Washington and the inability of other testamentary documents (i.e. non-CLTP planning tools) to avoid those dangers. Cuccia visited the homes of prospective clients and advised *1073 them that the CLTP was appropriate for their needs. He essentially took on the role of an estate planning attorney; a role that should have been occupied by Shepard. Instead of performing that role, Shepard delegated the legal services he had agreed to in his fee agreement to Cuccia. Clients believed their trust documents were effective because they believed the documents had been reviewed by Shepard, a lawyer. By allowing his name and title to be used to add legitimacy to the sale of the CLTP, Shepard aided Cuccia in the unauthorized practice of law. We agree with the Board. The Bar proved by a clear preponderance of the evidence that Shepard assisted in the unauthorized practice of law as alleged in count two.

Presumptive Sanction
¶ 23 We use ABA Standards std. 7.1 as a basic, but not conclusive, guide to determining the appropriate sanction for lawyer misconduct. In re Disciplinary Proceeding Against Burtch, 162 Wash.2d 873, 896, 175 P.3d 1070 (2008). In determining the appropriate sanction, we employ a two-step process. In re Disciplinary Proceeding Against Kronenberg, 155 Wash.2d 184, 195, 117 P.3d 1134 (2005). First, we examine the duty violated, the lawyer's mental state, and the potential or actual injury caused by the lawyer's misconduct to arrive at a presumptive sanction. Id. We then consider the existence of aggravating or mitigating factors that may alter the presumptive sanction. Id. The Board's recommended sanction receives great deference. "`[W]e should not lightly depart from recommendations shaped by [the Board's] experience and perspective.'" In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 343, 157 P.3d 859 (2007) (alterations in original) (quoting In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 94, 667 P.2d 608 (1983)).
¶ 24 Shepard's main contention is that the Board erred when it concluded that Shepard caused "serious or potentially serious injury" to his clients and that the presumptive sanction for violating count one was disbarment. ABA Standards std. 4.4 sets out the appropriate sanctions for lawyers found to have violated their duty to act with reasonable diligence and promptness in representing their clients. The ABA Standards state:
4.41 Disbarment is generally appropriate when:
(a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or
(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.
4.42 Suspension is generally appropriate when:
(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or
(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.
ABA STANDARDS at 10. The level of actual or potential harm or injury is one of the factors we consider in arriving at the presumptive sanction.
¶ 25 The ABA Standards define "injury" as:
harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from "serious" injury to "little or no" injury; a reference to "injury" alone indicates any level of injury greater than "little or no" injury.
Id. at 7.
¶ 26 "Potential injury" is defined as:
the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct.
Id.
¶ 27 The hearing officer concluded that Shepard engaged in a pattern of neglect causing "actual injury to his clients and the legal profession as a whole." CP at 14. *1074 Shepard argues that "actual injury" is not the same as "serious injury" and that had the hearing officer determined the injuries suffered by Shepard's clients were serious, he could have set forth that specific determination in his findings of fact. Shepard contends that, given the deference given to the hearing officer regarding findings of fact, "the Court should not presume any different `injury' and should not presume anything more than what was set forth in the findings and conclusions." Br. of Appellant at 18. While Shepard is correct that we give considerable weight to the hearing officer's findings of fact, we give greater weight to the Board's determination regarding sanctions. In re Cohen, 150 Wash.2d at 754, 82 P.3d 224. Where the Board's decision was unanimous, as it was in this case, we are reluctant to depart from its determination. See id. at 763, 82 P.3d 224.
¶ 28 Here the Board unanimously concluded that Shepard's lack of diligence caused serious or potentially serious injury to his clients and the legal profession. We agree. Shepard's negligence was not limited to one or even just a few clients. It affected over 70 people or couples referred to him by Cuccia. It involved a pattern and practice of misconduct affecting many people over a significant amount of time. Shepard did not provide the services he promised to any of these clients. He made no effort to determine if the CLTP was appropriate for their needs. Most of the purchasers of the CLTP did not need it, and in many cases the trust was actually detrimental to their estate planning goals. Beyond mailing out a form letter, Shepard made no effort to ensure that the CLTPs he approved were executed properly or that his clients understood how they worked. Some of Shepard's clients were still relying on improperly executed documents at the time of the disciplinary hearing. While the hearing officer concluded Shepard was not responsible for the insurance scheme perpetrated by Cuccia, his name lent credibility to the entire operation. His negligence enabled his business associate to exploit elderly and vulnerable clients, causing them serious injury. Shepard delegated his legal duties to Cuccia, a nonlawyer, and as a result caused them serious harm. Considering all the factors, including the duty violated, Shepard's state of mind with regard to the misconduct, and the seriousness of the harm or potential harm, we find the presumptive sanction for count one is disbarment.

Aggravating and Mitigating Factors
¶ 29 Once the presumptive sanction has been determined, we examine the aggravating and mitigating factors to decide if it is appropriate to alter the presumptive sanction. In re Kronenberg, 155 Wash.2d at 195, 117 P.3d 1134. Shepard argues that all of the mitigating factors found by the hearing officer should apply in this case. The Board disagreed and determined that the record did not support the hearing officer's conclusion that Shepard did not act with the absence of a dishonest or selfish motive or that he gave full and free disclosure to the disciplinary board. We agree with the Board's determination.
¶ 30 The ABA Standards state that the absence of a dishonest or selfish motive is a mitigator and the presence of said motive is an aggravator. In re Disciplinary Proceeding Against Carpenter, 160 Wash.2d 16, 30, 155 P.3d 937 (2007). Shepard bears the burden of proof as to whether the absence of dishonest or selfish motive should be included as a mitigating factor. In re Disciplinary Proceeding Against Trejo, 163 Wash.2d 701, 730, 185 P.3d 1160 (2008). The hearing officer found that charging a fee for a service is not a dishonest or selfish motive. We agree that merely charging a fee for a service would not generally support a finding of a dishonest or selfish motive. But the record clearly establishes that Shepard accepted fees from over 70 clients and did not perform the agreed services. While the hearing officer concluded that "[c]harging a fee for service is not a dishonest or selfish motive," CP at 21, we believe that charging a fee for performing little to no service is. Shepard received $200 from over 70 clients for performing no real legal work. He simply reviewed the CLTP information form to make sure his clients filled in their correct information. A charge of $200 for that level of service is selfish.
*1075 ¶ 31 Shepard further argues that he gave full and free disclosure to the Board when he wrote his letter to the Bar setting out his hypothetical lawyer involved in estate planning consultation services. But both the hearing officer and the Board found that the facts presented to the Bar in Shepard's hypothetical were inaccurate or misleading. We agree with the Board's conclusion that this letter "did not freely and accurately describe his conduct." CP at 32. Shepard did not establish this as a mitigating factor.
¶ 32 Finally, though Shepard implicitly argues that the Board's addition of the vulnerable victim aggravator was erroneous, he does not make a specific argument as to why this is so. Considering many of the victims were elderly couples, some of whom actually lacked testamentary capacity, we see no reason to deviate from the Board's decision to add this as an aggravating factor.

CONCLUSION
¶ 33 Although the Board concluded that disbarment was the presumptive sanction, it ultimately imposed a two-year suspension concluding that disbarment was not "necessary to protect the public or educate other lawyers." Id. at 33. Shepard's conduct fell well below the standards required of a lawyer performing estate planning services for his clients. He took money in return for performing little or no legal work and allowed his business associate to take advantage of his clients. Shepard's misconduct was not isolated but involved many clients over the course of two years. His involvement in the Cuccia living trust mill causes serious or potentially serious harm to both his clients and the legal profession as a whole. The Board concluded that Shepard's remorse is genuine and that he made a good faith effort to make restitution and rectify the consequences of his misconduct. Given Shepard's efforts to remediate the harm caused by his misconduct, we agree that disbarment is not necessary to protect the public or educate other lawyers. We therefore adopt the Board's recommendation and suspend Shepard from the practice of law for two years.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON and DEBRA L. STEPHENS, Justices.
SANDERS, J. (dissenting).
¶ 34 Attorney Richard Dale Shepard should be suspended from the practice of law for violating our Rules of Professional Conduct (RPCs). The majority, however, misperceives the legal and factual components of this case and, as a result, imposes too long a suspension. Because I would suspend Shepard for six months instead of two years, I dissent.

ANALYSIS
¶ 35 When determining the appropriateness of Washington State Bar Association Disciplinary Board (Board) recommendations, we first inquire whether the Board properly established the presumptive sanction. In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 342, 157 P.3d 859 (2007). This inquiry demands that we establish (1) the ethical duties violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's misconduct. Id. Next, we consider aggravating and mitigating factors. Id.
¶ 36 "The responsibility for disciplining Washington lawyers ultimately rests with this court." In re Disciplinary Proceeding Against Preszler, 169 Wash.2d 1, 15, 232 P.3d 1118 (2010). We exercise plenary authority in matters of attorney discipline. In re Disciplinary Proceeding Against Carmick, 146 Wash.2d 582, 593, 48 P.3d 311 (2002). "Although they are not conclusive, we give considerable weight to the hearing officer's findings, particularly when they involve the credibility and veracity of the witnesses." In re Disciplinary Proceeding Against Kuvara, 149 Wash.2d 237, 246, 66 P.3d 1057 (2003).

I. Assisting in the Unauthorized Practice of Law
¶ 37 The majority properly finds violations based on count 1 (failure to act with reasonable *1076 diligence), count 3 (failure to disclose possible conflict of interest), and count 5 (failure to make reasonable efforts to ensure associate's behavior harmonized with RPCs).[1] However, it improperly finds a violation based on count 2 (assisting in the unauthorized practice of law). Majority at 1072-73. I agree with the hearing officer that Shepard did not assist Steven Cuccia in the unauthorized practice of law.
¶ 38 The Board found Shepard "aided Mr. Cuccia's unauthorized practice of law by agreeing to represent clients in these transactions and allowing his name and title to add legitimacy to the sale." Clerk's Papers (CP) at 30 (Disciplinary Board Order at 7). But this statement mischaracterizes the facts. Shepard did not aid Cuccia by agreeing to represent these clients. In fact, Shepard's agreement to represent the clients could have conceivably worked against Cuccia's interests because Shepard could have advised clients against purchasing the living trusts. The problem here, instead, was that Shepard represented his clients poorly. Shepard's conduct violated a lawyer's duty to provide reasonable diligence, but it did not amount to assisting Cuccia in the unauthorized practice of law.
¶ 39 The majority also alleges that by allowing Cuccia to refer clients to Shepard, Shepard assisted Cuccia in the unauthorized practice of law (apparently it added "legitimacy" to Cuccia's operation). Majority at 1072-73. A lawyer's name and title do not guarantee legitimacy. Merely lending one's name to a nonlawyer's operation does not rise to assisting in the unauthorized practice of law.[2]
¶ 40 The majority focuses on the "practice of law," but skips over the "assisting" requirement. It improperly punishes Shepard for Cuccia's transgressions. See majority at 1071-73. There is no doubt Cuccia practiced law by marketing, selecting, and selling living trusts to clients. But Shepard's assistance to Cuccia's actual marketing, selection, and sale of truststhe practice of law here is an illusion. The majority overstates the case when it says, "Shepard delegated the legal services he had agreed to in his fee agreement to Cuccia." Majority at 1073. In reality Shepard did not delegate any legal services to Cuccia. He simply failed to perform some of them, and he performed others poorly. Shepard's lack of diligence is a violation based on count 1, not count 2.

II. Presumptive Sanction
¶ 41 The majority erroneously finds the presumptive sanction for count 1 to be disbarment.[3] Majority at 1074. The hearing officer, on the other hand, correctly identified the proper presumptive sanction: Suspension. See CP at 136 (Findings of Fact, Conclusions of Law and Hearing Officer's Recommendation (FFCL) at 20, ¶ 104).
¶ 42 The American Bar Association's (ABA) Standards for Imposing Lawyer Sanctions standard 4.4 (1991 & Supp. 1992) (ABA Standards) spells out, in broad terms, failures of reasonable diligence and promptness that qualify for disbarment or suspension. The difference hinges on whether the injury or potential injury to the lawyer's client was "serious." ABA STANDARDS stds. 4.41-4.42.
¶ 43 The facts here do not support a finding of serious or potentially serious injury to Shepard's clients for at least two reasons. First, the majority finds compelling that "Shepard's negligence was not limited to one or even just a few clients." Majority at 1074. But this factor does not weigh heavily upon the seriousness of the violation. If it did, it would render meaningless ABA Standards std. 4.42(b), which expressly finds nonserious *1077 injury can result from a "pattern of neglect." Id. It also flies in the face of the hearing officer's finding that only "actual injury" not serious injuryresulted from the "large number of clients, over 70 ... [which] constitute a pattern of neglect." CP at 130-31 (FFCL at 14-15, ¶¶ 88-89 (emphasis added)). Shepard here engaged in a pattern of neglect, but that pattern, by itself, does not make the injury serious.
¶ 44 Second, and determinatively, "`[u]nchallenged findings of fact made by the hearing officer and unchanged by the Board are viewed as verities on appeal.'" In re Disciplinary Proceeding Against Hicks, 166 Wash.2d 774, 781, 214 P.3d 897 (2009) (quoting In re Disciplinary Proceeding Against Perez-Pena, 161 Wash.2d 820, 829, 168 P.3d 408 (2007)). Here, the hearing officer found Shepard caused "actual injury"not serious injury. CP at 130 (FFCL at 14, ¶ 88). We recently found suspensionnot disbarmentto be the presumptive sanction for "actual and potential injury." In re Disciplinary Proceeding Against Holcomb, 162 Wash.2d 563, 586, 173 P.3d 898 (2007). Moreover, we recently held that failure to challenge an injury as serious binds our analysis to the hearing officer's determination. See Hicks, 166 Wash.2d at 787, 214 P.3d 897. We held:
The hearing officer also found that Hicks' conduct "causes injury or potential injury to a client, the public, or the legal system." She did not, however, find that the injury was "serious or potentially serious." Nor did the Board see fit to find Hicks' actions caused serious or potentially serious injury. Consequently, by the unchallenged findings of the hearing officer and the unanimous Board, [the ABA Standard for disbarment] does not apply.
Id. (citations omitted) (quoting Clerk's Papers at 210).[4]
¶ 45 Hicks is directly on point and determines the outcome of this issue. Here, the Board expressly adopted the hearing officer's findings of fact (CP at 24 (Disciplinary Board Order at 1)), including the finding of "actual injury" (quoting CP at 130 (FFCL at 14, ¶ 88)). By adopting the hearing officer's work, the Board did not "see fit to find [the lawyer's] actions caused serious or potentially serious injury." See Hicks, 166 Wash.2d at 787, 214 P.3d 897. Because the hearing officer's finding of actual injury was not challenged on appeal, we must assume the injury to Shepard's clients was not serious injury for purposes of the ABA Standards. The hearing officer correctly determined the presumptive sanction to be suspension.

III. Aggravating and Mitigating Factors
¶ 46 When we apply the proper mitigating factors to the proper presumptive sanction, it becomes clear the majority attempts too much. The majority relies on the Board to dismiss several mitigating factors, including (1) absence of dishonest of selfish motive and (2) full and free disclosure or cooperation with disciplinary board proceedings. Majority at 1074-75.
¶ 47 While it is true Shepard accepted a fee for substandard work, it is unfair to suggest he did absolutely no work at all. See majority at 1074 ("Shepard received $200 from over 70 clients for performing no real legal work."). He made (admittedly brief) phone calls to each of his clients. He also reviewed the trust documents Cuccia provided to his clients and enclosed a letter instructing clients how to execute them. CP at 121-22 (FFCL at 5-6). The majority's position today seems to suggest that when a lawyer accepts a fee for work that reflects a lack of reasonable diligence, the lawyer automatically acts with dishonest or selfish motive. I am not prepared to make that leap. Furthermore I believe Shepard has cooperated in these proceedings, as well as attempted to fully disclose his actions to the Board. I would give these mitigating factors their proper influence.[5]
¶ 48 To spotlight a separate mitigator, it bears noting that Shepard made a strong, *1078 timely, and good faith effort to rectify the consequences of his misconduct. When Shepard learned from an article in the Washington State Bar News that a lawyer's involvement in living trust operations could be improper, he wrote a "very detailed" letter to the Bar seeking guidance. CP at 128-29 (FFCL at 12-13, ¶¶ 78-79). The letter set out a hypothetical situation, which closely resembled the facts of Shepard's arrangement with Cuccia. The Bar ignored this letter. CP at 129 (FFCL at 13, ¶ 80). The majority faults Shepard for not penning a perfect recitation of the facts in his hypothetical situation, but perfection is not required. The point is that Shepard came to realize he might have made a mistake by dealing with Cuccia, and he took action to see if his conduct complied with the Rules. He could have ignored his actions and simply hoped they never came to light. But when it became clear that he had made a poor decision, Shepard wrote a letter to his clients to inform them of the State's investigation of Cuccia, and to urge them to schedule an appointment with him or another attorney. Id. (FFCL at 13, ¶ 81). He sent a follow-up letter to clients who did not respond to the first letter. Id. In light of these actions, I give Shepard's good faith effort to rectify his misconduct considerable weight.
¶ 49 At the end of the day, mitigators[6] outnumber aggravators[7] by a score of six to four. Against the backdrop of the proper presumptive sanctionsuspensionI agree with the hearing officer that Shepard should be suspended from the practice of law for six months instead of two years. He has shown genuine remorse and has taken significant steps to make things right. A lengthier suspension will serve no useful purpose as this lawyer has already learned a hard lesson.
¶ 50 I dissent.
NOTES
[1] The facts are taken primarily from the hearing officer's findings of fact and conclusions of law. Other than finding of fact 94, which was struck by the Board, neither party challenges the hearing officer's factual determinations. "[W]e accept as verities any unchallenged factual findings made by the hearing officer and approved by the Board." In re Disciplinary Proceeding Against Christopher, 153 Wash.2d 669, 677, 105 P.3d 976 (2005).
[2] Cuccia provided each client with a standard attorney-client fee agreement when they were sold the trusts. Each agreement contains the same terms with regard to the scope of service Shepard agreed to provide.
[3] The information form prepared for Shepard by ATDS was a checklist asking if the information provided by the client was correct. The form contained information such as the client's address, spouse, children's names, and general asset information.
[4] The RPCs were revised effective September 1, 2006.
[5] Shepard does not challenge the Board's determination that he violated counts one, three, and five. He only argues that the Board erred when it concluded that he violated count two as well.
[1] Shepard does not challenge these violations.
[2] Moreover, as the hearing officer recognized, while clients may have felt more secure knowing a lawyer would review the paperwork, that security should have been tempered by the fact that Cuccia himselfthe salesmanreferred Shepard's office. See CP at 125 (Findings of Fact, Conclusions of Law and Hearing Officer's Recommendation (FFCL) at 9, ¶ 53).
[3] While the majority does not articulate the presumptive sanctions for the remaining counts, the WSBA concedes suspension is appropriate for each. Answering Br. of the WSBA at 31-32. I note as well that even if Shepard had assisted Cuccia in the unauthorized practice of law (count 2), the presumptive sanction for that violation would also be suspension. Id.
[4] Hicks involved ABA Standards stds. 7.1 and 7.2, instead of ABA Standards stds. 4.41 and 4.42, but both make the same distinction between serious injury (leading to disbarment) and nonserious injury (leading to suspension).
[5] Conversely, I agree that Shepard's lack of diligence harmed vulnerable victims, some of whom were incompetent to execute the living trusts. See majority at 1074-75. Accordingly, I would include this as an aggravating factor.
[6] Mitigating factors included: (1) absence of prior disciplinary record; (2) absence of dishonest or selfish motive; (3) timely good faith effort to make restitution or rectify consequences of misconduct; (4) full and free disclosure to Board or cooperative attitude toward proceedings; (5) character or reputation; and (6) remorse.
[7] Aggravating factors included: (1) pattern of misconduct; (2) multiple offenses; (3) substantial experience in the practice of law; and (4) vulnerable victims.