# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE___OCT 1 7 2013

~~Madsen, C.J.~~

CHIEF JUSTICE

This opinion was filed for record
at _8:00 a.m._ on _Oct 17, 2013_

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| In the Matter of the Disciplinary Proceeding Against<br><br>JOE WICKERSHAM, an Attorney at Law. | NO. 201,088-1 (WSBA #18816)<br><br>EN BANC<br><br>Filed _____ OCT 1 7 2013 |
| --- | --- |

STEPHENS, J.—This is an attorney discipline matter involving events during a time when the petitioner, Joe Wickersham, was experiencing mental health issues. The hearing officer recommended disbarment. The disciplinary board (Board) rejected some misconduct findings and reduced the sanction to a three-year suspension. We adopt the Board's recommendation and order Wickersham to complete a three-year suspension, and additional conditions, before resuming the practice of law.

## FACTS AND PROCEDURAL HISTORY

Wickersham was admitted to practice in the state of Washington in 1989. At the time of the events giving rise to these proceedings, he was a solo practitioner

with an office in the city of Renton. He had been previously reprimanded by the Washington State Bar Association (WSBA) in 2006 for an improper fee agreement and improper handling of client funds. Ex. A-136.

The events that led the Board to recommend a three-year suspension for Wickersham began in June 2010 and center around two clients, Walter Zimcosky and Jonathan Griffin.[1] In August 2010, Wickersham abruptly left Washington for approximately three weeks. An outgoing voice message on his office telephone stated his office was permanently closed. *See* Answering Br. of WSBA (App. E) (hereinafter Answer) (transcription of the outgoing message). The WSBA believed he did not resume practice until approximately the end of December 2010, giving rise to an additional grievance that Wickersham abandoned his practice in violation of the rules of professional conduct.

### The Zimcosky Matter

Wickersham represented Walter Zimcosky in the Auburn Municipal Court on a charge of driving under the influence. Zimcosky's wife had retained Wickersham's services with a $3,500 check. A hearing on a motion to suppress filed by Wickersham was scheduled for June 14, 2010, but Wickersham called the court the night before to say he was ill and could not attend, though he apparently did not notify Zimcosky, who appeared at the hearing. Findings of Fact,

---

[1] The WSBA brought a grievance involving a third client, Raymond Ballard, but the Board struck all findings of fact and conclusions of law relating to that client and struck one count of misconduct premised solely on Wickersham's representation of Ballard.

Conclusions of Law and Hr'g Officer's Recommendation (hereinafter Hr'g Officer's Decision) at 3 (Findings of Fact (FF) 13). The hearing was continued to June 18. On that date, Wickersham appeared but exhibited exceedingly odd behavior in the courtroom. He was agitated, sweating, fidgeting, pulled strange faces, including baring his teeth at observers, and engaged in "shadow boxing" or "karate moves." I Verbatim Transcript of Proceedings (VTP) (Sept. 6, 2011) at 27. He asked nonsensical questions and made rambling objections. A prosecutor observing the spectacle testified that he had "never seen anything like it in my entire career, and that includes defendants, that includes mental health hearings, anything. I've never seen anything like it." *Id.* at 25. The court recessed. Wickersham returned 35 minutes late from the break, at which time he was informed that the court had struck the motions. Wickersham "laughed hysterically, very loudly and walked off laughing down the hallway." *Id.* at 33.

On June 21, 2010, the city of Auburn moved to continue the trial due to prosecutors' concerns that Wickersham was not providing effective counsel. Wickersham continued to act erratically at that hearing as well. Following the hearing, Auburn City Prosecutor Harry Boesche filed a motion to disqualify Wickersham. Hr'g Officer's Decision at 4 (FF 19-20). On July 16, 2010, the court considered the motion but declined to remove Wickersham from representing Zimcosky because the court was unsure what the proper legal standard was for the issue. *Id.* at 5.

In the days that followed, Wickersham left a number of bizarre voice mails for Auburn City Attorney Daniel Heid. *Id.* On July 22, 2010, Wickersham was taken by police for a mental health evaluation at a hospital and diagnosed with a substance abuse induced psychosis. *Id.*; Ex. R-8.[2] On July 23, 2010, the court reconvened to address the never-resolved CrR 3.5/3.6 motions. Wickersham again behaved erratically. He told the court he was starting to shake, was going to die, and had to go. Ex. A-129A (Tr. of July 23, 2010 Mot. Hr'g at 9). The hearing ended when the court set the matter over again to July 30. On July 26, 2010, Wickersham left another message for Heid. Hr'g Officer's Decision at 5 (FF 25). Like his previous voice messages, this one relayed Wickersham's belief that several individuals in local government and law enforcement were involved in some sort of cover-up or conspiracy in which Wickersham was being victimized. Wickersham also spoke to Heid on the phone approximately three times. As a result of these interactions, Heid filed a grievance with the WSBA.

On the morning of July 30, 2010, Wickersham left a message with the WSBA explaining that he was not going to attend the hearing on the CrR 3.5/3.6 motion, noting again his belief that there was a conspiracy against him. Hr'g Officer's Decision at 6. Although Wickersham never formally withdrew from

---

[2] It is unclear how this diagnosis was arrived at, whether by self-report or medical testing. Other exhibits corroborate the possibility of a cocaine induced psychosis, *see* Ex. R-11, but the source of that information is unclear as well. At any rate, the record shows that if Wickersham was experiencing drug-induced psychosis in the summer of 2010, his diagnoses at the time of hearing were a host of organic brain impairments, including a mood disorder, posttraumatic stress disorder, and possible delusional disorder. *See* III VTP (Sept. 8, 2011) at 527 (testimony of licensed mental health counselor Jonathan Goodman).

Zimcosky's case, and was not granted permission to do so by the court in accordance with CrRLJ 3.1(e), he did nothing more on Zimcosky's case following the message to the WSBA on July 30. Zimcosky ended up representing himself and pleaded guilty to reckless driving. *Id.* at 7. Zimcosky was also not able to recover his retainer from Wickersham, and though no count of misconduct is premised on this, restitution was ordered.

The Griffin Matter

Wickersham was hired to represent Jonathan Griffin in Cowlitz County Superior Court on a felony charge with a firearm enhancement, in addition to several other unrelated city and municipal court matters. Hr'g Officer's Decision at 10. Wickersham went to court with Griffin on two occasions in spring 2010 and filed a motion to suppress on June 30, 2010. But Wickersham failed to appear for a motion hearing on August 19, 2010. Apparently he had notified his client that he would not be present, but he did not notify the court or the prosecutor. *Id.* at 11 (FF 54). Griffin spoke with Wickersham during the hearing, and Wickersham agreed to reset the hearing to August 26, 2010. *Id.* at 11. But instead, Wickersham went to the Cowlitz County Superior Court on August 23, 2010. Finding no motion hearing set, he left without speaking to court staff. He testified he terminated services to Griffin the same day. *Id.* at 12. On August 26, 2010, the court struck the trial date and set the matter over to September 8, 2010. At the September 8, 2010 hearing, Griffin indicated that he had learned second-hand the week prior that Wickersham was "definitely not going to be practicing law" any

longer. Ex. A-102A at 2. Wickersham had no further contact with the court, never filed a notice of withdrawal with regard to Griffin, and did not seek permission to withdraw in accordance with CrR 3.1(e). Griffin eventually retained new counsel. Judge James Stonier filed a grievance. (There is no count of misconduct concerning any fees paid by Griffin to Wickersham.)

Abandonment of Practice

As noted above, Wickersham exhibited serious mental health issues beginning in roughly June 2010. Matters grew worse when on August 22, 2010, his service dog[3] was apparently shot and killed by a fish and wildlife officer. It is difficult to ascertain from the record what actually happened with regard to the shooting, but there seems to be no debate that the dog was killed. Of less certainty is whether Wickersham's office and/or home was burglarized sometime that summer, as he believes. But Wickersham developed the belief that he was the target of a criminal element and that his life was in danger. On August 23, 2010, when he traveled to Cowlitz County, Wickersham had some kind of interaction with a person he believed was part of the scheme to do him harm. *See* II VTP (Sept. 7, 2011) at 385-88. As noted, he left Cowlitz County without confirming the correct court date, and returned to his home. From there he packed up his car and his 16-year-old son. In his son's words, the pair "fled our county and our house and we drove [through] eight states," including a stop in Montana to abandon their car and buy a different one. *Id.* at 388-89. Wickersham was

---

[3] Wickersham is visually impaired.

incommunicado, and his office was closed for several months following his departure, although it appears he returned to Washington sometime in late September or early October. Hr'g Officer's Decision at 17 (FF 79-81); II VTP (Sept. 7, 2011) at 389.

## Disciplinary Proceedings

Following these events, the WSBA initiated disciplinary proceedings against Wickersham.[4] The WSBA apparently did not seek an interim suspension. In September 2011, a hearing took place. Wickersham represented himself. It should be noted that the transcript of the hearing demonstrates a degree of continued impairment in Wickersham. His testimony rambles in places, and he has trouble staying focused. He frequently reiterates his belief that some kind of conspiracy against him had occurred in summer 2010 and that he had been in danger.

After the hearing, the hearing officer rendered a decision, finding seven counts of misconduct against Wickersham. As noted, the Board struck one count and struck the findings of fact and conclusions of law relating to client Raymond Ballard. The remaining counts before this court are

- COUNT 1: By failing to attend his clients' scheduled court appearances, without explanation or formal withdrawal, Wickersham violated RPC 8.4(d).

- COUNT 2: By abruptly ending his representation of Griffin and Zimcosky, without taking steps to ensure that his client's interests were protected, Wickersham violated RPC 1.16(d).

- COUNT 3: [Stricken by the Board].

---

[4] Nothing in the record indicates whether the WSBA considered disability proceedings under Title 8 of the Rules for Enforcement of Lawyer Conduct, rather than disciplinary proceedings.

- COUNT 4: By failing to tell Griffin or Zimcosky that he had ceased practicing law and would no longer represent them, Wickersham violated RPC 1.4(b).

- COUNT 5: By acting in an inappropriate manner at some court appearances and failing to appear at others, and by failing to properly withdraw from Zimcosky's case, Wickersham violated RPC 8.4(d) and RPC 1.3.

- COUNT 6: By failing to competently represent Zimcosky during court appearances, Wickersham violated RPC 1.1.

- COUNT 7: By committing [acts as described in the formal complaint], Wickersham abandoned his practice, demonstrating unfitness to practice law in violation of RPC 8.4(n).

The hearing officer found that the presumptive sanction was suspension for all violations except count 6 (reprimand) and count 7. He concluded that the presumptive sanction for count 7 (abandonment of practice) was disbarment. Hr'g Officer's Decision at 26 (citing ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (ABA STANDARDS) std. 4.4 (1991 & Supp. 1992)). He found four aggravators and no mitigators in Wickersham's case. Accordingly, the hearing officer recommended disbarment, with restitution in the amount of $3,500 to Zimcosky. He also ordered a mental health reexamination prior to Wickersham ever being reinstated.

The Board amended the hearing officer's decision to account for the mitigator of personal or emotional problems based on the evidence in the record of Wickersham's severe mental health issues in summer 2010. The Board also struck one of the aggravators found by the hearing examiner, a pattern of misconduct. Accordingly, it unanimously reduced the sanction to a three-year suspension and

adopted the restitution order. It further adopted the hearing officer's other recommendations regarding reinstatement. Namely, before Wickersham may return to practice, he must undergo an independent examination by a licensed clinical psychologist or psychiatrist chosen by the WSBA, 30 days prior to a request for reinstatement, and execute all necessary releases to permit the evaluator to obtain all necessary treatment records. Further, the evaluator must make a report to the WSBA addressing (1) whether Wickersham has recovered from any issue identified by the evaluator as influencing Wickersham's performance as a lawyer and (2) whether Wickersham's condition is such that he is currently fit to practice law.[5] Wickersham challenges the decision.

## ANALYSIS

In disciplinary proceedings, we review conclusions of law de novo and will uphold them if they are supported by the findings of fact. *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 59, 93 P.3d 166 (2004). "'"Substantial evidence exists if the record contains evidence in sufficient quantum to persuade a fair-minded, rational person of the truth of declared premise."'" *In re Disciplinary Proceeding Against Ferguson*, 170 Wn.2d 916, 927, 246 P.3d 1236

---

[5] The Board adopted the hearing officer's further recommendation that if the anticipated evaluation finds Wickersham not fit to practice law, then Wickersham, the evaluator, and the WSBA will meet to discuss the report and decide what steps can be taken to address the evaluator's concerns. If an agreement cannot be reached, Wickersham and the WSBA will present written materials and argument to the Board. The Board will decide under what conditions Wickersham may return to the active practice of law. The hearing officer specified that Wickersham will bear all costs associated with complying with the terms and conditions of reinstatement as set forth in the officer's decision.

(2011) (quoting *In re Disciplinary Proceeding Against Botimer,* 166 Wn.2d 759, 767 n.3, 214 P.3d 133 (2009) (quoting *In re Disciplinary Proceedings Against Bonet,* 144 Wn.2d 502, 511, 29 P.3d 1242 (2001))). We afford great deference to the Board's recommended sanction but retain the ultimate authority for determining the appropriate sanction for an attorney's misconduct. *Id.* at 939. When a sanction is recommended by a unanimous Board, we generally adopt it unless there is a clear reason for departure. *Id.* at 939-40.

As an initial matter, we must determine the scope of what is before us. Wickersham assigned error to several of the hearing officer's findings of fact and conclusions of law and the Board's adoption of those challenged portions of the hearing officer's decision. Opening Br. of Joe Wickersham (Opening Br.) at 5. Specifically, he contends that (1) the hearing officer erred in finding knowing misconduct; (2) the hearing officer erred in finding injury to clients Griffin and Zimcosky; (3) the hearing officer erred in finding abandonment of practice; (4) the hearing officer erred in finding the misconduct alleged in counts 1, 2, and 4 through 7; (5) the Board erred in adopting the hearing officer's finding regarding the Griffin and Zimcosky matters and abandonment of practice; (6) the Board erred in recommending suspension for three years, restitution, and other discipline; (7) the Board erred by failing to consider proportionality in its recommendation; and (8) the hearing officer and Board failed to find the mitigating factors of remorse, reputation, remoteness of prior discipline and absence of dishonest motive. *Id.*

But the WSBA argues that Wickersham failed to brief or argue several of these assignments of error and that his challenges are therefore waived. Answer at 15 (noting that RAP 10.3(a)(6) is applicable to these proceedings under ELC 12.6(f) and requires a party to provide argument in support of the issues presented for review along with citations to the record and legal authority). The only findings and conclusions Wickersham actually argues, the WSBA contends, are those related to the sanction. *Id.*

The WSBA is correct that Wickersham failed to adequately brief and argue some of his assignments of error. But it concedes that he adequately challenged his sanction. A sanction discussion requires this court to consider the ethical duty violated, the lawyer's mental state, the injury caused, and aggravating or mitigating circumstances. *In re Disciplinary Proceeding of Marshall*, 160 Wn.2d 317, 342, 157 P.3d 859 (2007). Thus, consideration of the sanction here requires review of several of Wickersham's assignments of error, including his mental state at the time of the conduct (assignment of error 1) and whether there was injury (assignment of error 2). His briefing, however bare it may be, does touch on these questions. *See* Opening Br. at 12; Reply Br. of Joe Wickersham (Reply) at 3. And it clearly addresses the questions of mitigating and aggravating factors and proportionality. *See* Opening Br. at 12-13. His briefing also clearly makes an argument as to whether the evidence supported the critical finding that he abandoned his practice. *Id.*

As to Wickersham's remaining assignments of error, the WSBA is correct that he has not preserved those adequately with appropriate argument and authority. Thus, we do not review Wickersham's assigned error 4, nor whether the Board erred in adopting the hearing officer's finding regarding the Griffin and Zimcosky matters (the first part of assignment of error 5). Because Wickersham gives us no basis to question them, we accept as verities the hearing examiner's findings of fact regarding the violations arising from Wickersham's handling of the Griffin and Zimcosky matters, and the Board's adoption of them, as well as any conclusions of law flowing from them.

Citing this court's recent opinion in *In re Disciplinary Proceeding Against Conteh*, 175 Wn.2d 134, 284 P.3d 724 (2012), Wickersham claims that court will forgive technical violations of the rules of appellate procedure. Reply at 2. But in *Conteh*, while the respondent failed to enumerate his assignments of error, he did clearly delineate them within his brief's headings and devoted separate paragraphs to his assignments of error. 175 Wn.2d at 133-34. Here we have the opposite situation: a numbered list of assignments of error, but no supporting briefing. This is not a technical violation this court will overlook.

But as noted, Wickersham did adequately preserve several of his assignments of error and we will now turn to them, beginning first with the contested area of misconduct—abandonment of practice—before turning to a discussion of the appropriate sanction. Because the abandonment count alone

carries the presumptive sanction of disbarment, resolution of this count governs the sanction analysis.

A. Challenged RPC Violation: Abandonment of Practice

The Board agreed with the hearing officer that Wickersham abandoned his practice in summer 2010 until December 2010, violating a number of RPCs related to the administration of justice, client communications, protecting client interests, proper withdrawal from a case, competent representation, and fitness to practice law. Hr'g Officer's Decision at 22-24 (citing RPC 8.4(d), 1.16(d), 1.4(b), 1.3, 1.1, 8.4(n)). The hearing officer found, and the Board agreed, that the WSBA proved the violations by a clear preponderance of the evidence. *Id.* In so concluding, the hearing officer relied on Wickersham's abrupt withdrawal from the Griffin and Zimcosky matters, as well as the fact that his office was closed for several weeks beginning in August, and an outgoing message on his office voice mail stated that the office was permanently closed. Between August and December 2010, no one checked the mail or answered the phone at the office. Hr'g Officer's Decision at 17 (FF 80). The hearing officer found that Wickersham had between 8 and 12 clients as of August 2010, when he fled the state.

Wickersham argues that the WSBA failed in its burden to prove by a clear preponderance of the evidence that he abandoned his practice. He contends that during the period between August and December 2010, he was in contact with many of his clients. He notes that there is no evidence he missed any court appearances or that he failed to act on behalf of a client outside of the isolated

instances involving Griffin and Zimcosky in summer 2010. He also contends that while he closed his physical office, he transported all his files and office equipment to his home and continued his practice from his home during the period in question. Reply at 3-4. Wickersham faults the WSBA for relying on the outgoing message on his voice mail, and some voice mail messages he left for others, to establish abandonment when those messages were "made during a time of extreme emotional distress" and are contravened by his conduct and actions at that time. *Id.* at 3.

Considering the entire record, this is a close call, but we conclude that the WSBA proved Wickersham abandoned his practice by a clear preponderance of the evidence. The question is close because there appears to be nothing in the record about the 8 to 12 clients Wickersham was representing in addition to Griffin and Zimcosky. He is correct that the WSBA has not presented evidence that any other clients besides Griffin and Zimcosky were "abandoned." But, no evidence other than Wickersham's testimony supports his claim that he was practicing out of his home during this period. His own witness, a client in a personal injury case who retained Wickersham in June 2010, testified that Wickersham contacted him in mid-September or October of that year to say he could no longer provide representation and refunded a retainer. III VTP (Sept. 8, 2011) at 561. It is difficult to overcome the outgoing message on his voice mail that his office was permanently closed and testimony that the office voice mail and physical mail was not checked during this period. If Wickersham was indeed running his office from

his home during the time period in question, there are no outward manifestations of that. We affirm the WSBA's determination that Wickersham abandoned his practice, per count 7.

B. Sanction

Having concluded that Wickersham abandoned his practice in addition to the other violations identified, the hearing officer identified standard 4.4 of the ABA *Standards*, "Lack of Diligence," as the appropriate guidepost. The presumptive sanction where a lawyer abandons his practice and causes serious or potentially serious injury to his client is disbarment. ABA STANDARDS std. 4.41(a). The Board mitigated the presumptive sanction by finding the presence of personal or emotional health problems. Board Order Amending Decision at 5 (Board Order). It also struck the hearing examiner's aggravating factor of a pattern of misconduct. Accordingly, it reduced the hearing examiner's recommended sanction from disbarment to a three-year suspension.

The imposition of a sanction involves a two-step process. First, the presumptive sanction is determined considering the ethical duty violated, the lawyer's mental state, and the extent of actual or potential injury. *Conteh*, 175 Wn.2d at 150. Second, aggravating and mitigating circumstances are considered to determine whether a departure from the presumptive sanction is warranted. *Id.* If raised by the attorney, this court will "additionally consider[] the proportionality of the sanction and the degree of unanimity among the board members." *Id.*

1. Mental State

As an initial matter, the hearing officer concluded that Wickersham's conduct was knowing as to several counts, including abandonment of his practice. *See, e.g.,* Hr'g Officer's Decision at 20, 24, 25 (FF 103, Conclusions of Law 125, 128). This is a debatable conclusion. A knowing violation of the rules of professional conduct requires the WSBA to show that the attorney "had 'the conscious awareness of the nature or attendant circumstances of [his] conduct.'" *In re Disciplinary Proceeding Against Preszler*, 169 Wn.2d 1, 21-22, 232 P.3d 1118 (2010) (quoting ABA STANDARDS, Definitions at 17). Given the extreme nature of the mental health issues Wickersham was experiencing in summer and fall 2010, he argues he was not aware of the nature or attendant circumstances of his conduct. Indeed, much if not all of his conduct appears to have been driven by the belief that he was at the center of an elaborate conspiracy by the Auburn police, which also implicated federal and state law enforcement, and that he was in mortal danger. That fear seems to have driven his decision to abruptly flee Washington and also appears to have motivated him to miss the court dates he did and withdraw from representing Griffin and Wickersham. We could fairly conclude that Wickersham was unaware of the nature or attendant circumstances of his conduct and thus did not act knowingly. On the contrary, his thought processes appear to have been singularly divorced from reality during summer and fall 2010.

That said, there is no mental state component to the sanction set forth in standard 4.41(a). It is unnecessary to find Wickersham's misconduct knowing.

Because we find that substantial evidence supports the conclusion that Wickersham abandoned his practice, the presumptive sanction of disbarment applies regardless of whether the conduct was knowing.

### 2. Injury

Substantial evidence exists to support the hearing officer's conclusion that there was serious injury or potentially serious injury to Wickersham's clients, the public, or the legal system or the profession. Wickersham argues a "no harm, no foul" approach as to whether Griffin and Zimcosky suffered harm. *See* Opening Br. at 12. But even if we accepted his view that neither client suffered actual harm, his argument ignores the fact that both clients were at risk of *potentially* serious harm and that Wickersham's other clients were also at risk of potentially serious harm, as was the public. Regardless of whether Wickersham had much control over his actions, his conduct in abruptly withdrawing from at least two matters and disappearing with no recourse for his clients to contact him indisputably meets the injury threshold.

### 3. Aggravators and Mitigators

The hearing officer found the following aggravators: prior offenses, a pattern of misconduct, multiple offenses, and substantial experience in the practice of law. The hearing officer found there were no applicable mitigating factors, "unless the Disciplinary Board or the Supreme Court believes Respondent was so impaired that he could not knowingly have caused the harm outlined above." Hr'g Officer's Decision at 26.

a. *Aggravators*

As explained above, the Board struck the aggravator related to a pattern of misconduct, concluding that "misconduct in two client matters related in time to one event in [Wickersham's] life" did not establish a pattern. Board Order at 4. It adopted the hearing officer's remaining findings of aggravated circumstances for a prior offense, multiple offenses, and substantial experience in the practice of law.

Wickersham challenges only one of the aggravators, arguing that his prior instance of misconduct is too remote in time to be given weight here. "This court ... routinely considers similar misconduct dating back many years to determine whether prior disciplinary offenses serve as an aggravating factor." *In re Disciplinary Proceeding Against VanDerbeek*, 153 Wn.2d 64, 92, 101 P.3d 88 (2004). We have indicated that the passage of time is less important to determining whether previous misconduct is remote than the similarities between the episodes of misconduct. *Id.* Wickersham's prior 2006 reprimand involved the misuse of a retainer fee in 2005, which is similar to some of his conduct here. Thus, the hearing officer and the Board correctly considered this aggravator in imposing a sanction.

b. *Mitigators*

Wickersham argues that the following mitigators are applicable here: mental disability, lack of dishonest motive, remorse, and good reputation. As the Board did, we recognize a mitigating circumstance for personal or emotional problems, but not for mental disability. We also conclude that substantial evidence supports

finding mitigating circumstances for an absence of dishonest motive and remorse, but not for good reputation.

### (1) Mental Disability or Personal/Emotional Problems

The Board agreed with the hearing examiner that the mitigator of "mental disability" could not apply as there was no evidence to support the four requirements under the appropriate ABA *Standards*. A mental disability may be considered as a mitigator only if

> (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
> (2) the chemical dependency or mental disability caused the misconduct;
> (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
> (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

ABA STANDARDS std. 9.32(i) (Supp. 1992). Wickersham appears to argue that this mitigator should apply, noting that "his alleged misconduct was caused by his temporary mental condition." Opening Br. at 16.

The hearing officer and the Board correctly concluded that Wickersham did not present evidence to support mitigation under ABA *Standards* std. 9.32(i). Specifically, he has not shown a meaningful and sustained period of rehabilitation or that recovery arrested the misconduct and recurrence of the misconduct is unlikely. There are no specific findings of fact to this effect, but the record reveals that Wickersham's sole mental health expert opined that Wickersham was "improving dramatically" and if he continued with treatment, "would be able to

return to full functioning at some time in the fairly near future." III VTP (Sept. 8, 2011) at 532.

In other words, at the time of the hearing, the evidence suggests that Wickersham was not recovered to the point that he could demonstrate a meaningful and sustained period of successful rehabilitation. Moreover, his mental health provider explained that at the time of the hearing, his recommendation would be that Wickersham return to practice in "a measured way, . . . doing small amounts of work and seeing how he reacts to it." *Id.* at 544. His testimony did not unequivocally suggest that a recurrence of Wickersham's problems was unlikely at that point. Thus, as strongly as the evidence suggests that severe mental health issues gave rise to the conduct at issue, we cannot add the mitigator of mental disability to Wickersham's sanction analysis.

However, the Board correctly recognized a mitigating circumstance for personal or emotional problems based on mental health issues, citing Wickersham's diagnoses of mood disorder, posttraumatic stress disorder, and very likely major depressive disorder, and noting the hearing officer's finding that there was evidence Wickersham's chemical dependency and/or mental disability contributed to the misconduct. Board Order at 4. There is substantial evidence supporting the finding of this mitigator.

The Board noted that issues of mental disability or chemical dependency are given varying degrees of weight depending on how greatly such factors contributed to the conduct, though it made no finding as to the weight the mitigator should be

given here. *Id.* (citing ABA STANDARDS std. 9.32). But the evidence easily suggests that Wickersham's mental disability was at least a substantially contributing cause of his offense and thus should be given great weight. We therefore hold that the mitigator of mental disability does not apply but that the mitigator of personal/emotional problems as a result of mental health issues is given great weight.

### (2) Absence of Dishonest Motive

The hearing officer also made no findings regarding the absence of a dishonest motive. But the record here is replete with evidence that Wickersham acted not for any kind of personal gain, but during episodes of serious mental health issues. On this record, we hold that a mitigator recognizing the absence of a dishonest motive applies.

### (3) Remorse

It is unclear whether Wickersham argued before the hearing officer that his remorse for what occurred should mitigate his sanction. But the hearing officer concluded that as of the time of hearing, Wickersham was "still in denial that his actions had any adverse impact on either his clients or the justice system." Hr'g Officer's Decision at 21. Wickersham's perceived lack of appreciation for his actions, however, could very well have been the result of a continued impairment due to mental illness. His testimony during his hearing evinced that he continued to believe he had been the target of a large conspiracy masterminded by several law enforcement agencies. *See, e.g.*, II VTP (Sept. 7, 2011) at 399-416. Indeed,

several portions of the transcript from the hearing leave the impression that Wickersham continued to experience a marked degree of impairment due to mental illness at the time of the hearing.

But Wickersham did explain in testimony at the hearing that at the time of the misconduct, he "really wasn't quite—quite [in] my right state of mind." I VTP (Sept. 6, 2011) at 287. He also explained that during summer 2010, "I've never been at a lower point in my life. I've been in dark places . . . . I can tell you I'm very sorry for whatever burden I may have imposed on anybody." II VTP (Sept. 7, 2011) at 416.

In sum, the record reflects that Wickersham expressed genuine regret and remorse for the events of summer and fall 2010, the articulation of which was somewhat complicated by continuing mental health issues. On balance, the evidence supports a finding of remorse, and we conclude this mitigator applies.

(4) Reputation

The hearing officer made no finding regarding Wickersham's reputation. Wickersham points to testimony from one colleague attesting to Wickersham's excellent standing among attorneys. III VTP (Sept. 8, 2011) at 556-59. In the absence of any findings, however, this is not enough to meet the substantial evidence test. We decline to apply a mitigator for good reputation.

Overall, we apply a prior offense aggravator. We hold that the mitigator of mental disability does not apply here but that the mitigator of personal/emotional problems as a result of mental health issues is given great weight. We apply a

mitigator for the absence of a dishonest motive and for the presence of remorse. We decline to apply a mitigator for good reputation in the absence of substantial evidence supporting such a finding.

### 4. Proportionality

Wickersham argues that his sanction is not proportional. He cites several cases in which the misconduct appears as or more grievous than his own and in which the attorney received a lesser sanction. Opening Br. at 13-14 (citing *Conteh*, 175 Wn.2d 134; *Ferguson*, 170 Wn.2d 916; *In re Disciplinary Proceeding Against Longacre*, 155 Wn.2d 723, 122 P.3d 710 (2005); *In re Disciplinary Proceeding Against Dynan*, 152 Wn.2d 601, 98 P.3d 444 (2004); *In re Disciplinary Proceeding Against Miller*, 99 Wn.2d 695, 663 P.2d 1342 (1983); *In re Disciplinary Proceeding Against Grubb*, 99 Wn.2d 690, 663 P.2d 1346 (1983). The WSBA responds that some of the cases Wickersham cites predate the adoption of the ABA *Standards*, which were meant to provide a uniform framework, and hence cases that predate it have little value in a proportionality review. Otherwise, the WSBA argues, the cases cited by Wickersham do not involve similar misconduct.[6]

"Proportionate sanctions are those which are "'roughly proportionate to sanctions imposed in similar situations or for analogous levels of culpability.''"

---

[6] Following oral argument in this case, the WSBA submitted additional authority consisting of Board decisions in cases that were never appealed to this court. Wickersham moved to strike the additional authority as improper. We deny Wickersham's motion but have not relied on the WSBA's supplemental authority in rendering this opinion and therefore need not visit the merits of Wickersham's objection.

*Dynan*, 152 Wn.2d at 623 (quoting *In re Disciplinary Proceeding Against Anschell*, 141 Wn.2d 593, 615, 9 P.3d 193 (2000) (quoting *In re Disciplinary Proceeding Against Gillingham*, 126 Wn.2d 454, 469, 896 P.2d 656 (1995))). The WSBA is correct that we should be wary of relying on cases that predate the adoption of the ABA *Standards* in a proportionality review; the inconsistencies among such cases was the primary reason the ABA *Standards* were developed.

At least one of the post-ABA *Standards* cases cited by Wickersham involves misconduct for which, as here, the presumptive sanction was disbarment, reduced to suspension. *Dynan*, 152 Wn.2d at 623. In *Dynan*, the attorney had knowingly submitted false declarations for attorney fees. *Id.* at 607. The presumptive sanction was disbarment. *Id.* But after reviewing cases of similar misconduct, this court ordered a six-month suspension. *Id.* at 623-25.

Likewise, in *In re Disciplinary Proceeding Against McLendon*, 120 Wn.2d 761, 845 P.2d 1006 (1993) the Board ordered disbarment of an attorney who converted client funds. *Id.* at 768-69. This court reduced the sanction to a two-year suspension based on the fact that *McLendon* was suffering from bipolar disorder during all times relevant to the misconduct. *Id.* at 773.[7] Based on both the nature of the conduct and the level of culpability, *McLendon* is a similar case. However, the opinion in *McLendon* repeatedly emphasized that the attorney's mental illness was being successfully treated at the time of the hearing, so that the

---

[7] At the time of the *McLendon* decision, the court credited *McLendon* with the three years on interim suspension he had already completed toward his two-year suspension, and thus he effectively could return to practice immediately.

public was not at risk if he were allowed to return to practice. *Id.* at 766, 774. There is no such evidence that Wickersham's mental health issues are resolved. *McLendon* does not suggest Wickersham's sanction is disproportionally harsh.

However, in 2010, we imposed a two-year suspension instead of disbarment on an attorney whose conduct was arguably worse than Wickersham's. *In re Disciplinary Proceeding Against Shepard*, 169 Wn.2d 697, 239 P.3d 1066 (2010). There the attorney, Shepard, associated himself with a living trust scam targeted at seniors. *Id.* at 701. The presumptive sanction for such misconduct is disbarment. *Id.* at 715. His aggravators included a pattern of misconduct and taking advantage of vulnerable victims, as well as substantial experience and multiple offenses. *Id.* at 707-08. As mitigators, the Board found he was remorseful, had a good reputation, had made a good-faith effort to make restitution, and the absence of a prior record. *Id.* at 708. Considering the mitigators and reasoning that disbarment was not necessary to protect the public or educate other lawyers, the Board unanimously recommended a two-year suspension rather than disbarment. *Id.* This court agreed. *Id.* at 716-18.

Hence, both *Shepard* and this case involved conduct that gave rise to a presumptive sanction of disbarment, but where the sanction was reduced to suspension. It may be argued that *Shepard* presents a more egregious case of misconduct, suggesting that Wickersham's sanction should be suspension of less than two years. On the other hand, it appears the determinative factor in *Shepard* was the absence of a need to protect the public. *See* 169 Wn.2d at 716. Here,

Wickersham's mental health does not appear to have stabilized to such a degree that concern for the public is not an issue, suggesting that a three-year suspension is not disproportionately harsh even compared to *Shepard*.

On balance, Wickersham has not met his burden to show a three-year suspension is disproportionate. While the *Dynan* case provides an example where misconduct carrying a presumptive sanction of disbarment was reduced to a minimum sanction, there are obvious factual differences in the nature of the misconduct at issue here. And, while the court in *McLendon* displayed some leniency toward a lawyer whose mental illness contributed to very serious misconduct, the evidence established that the lawyer was successfully participating in treatment and that the risk of recurring misconduct was very remote. The testimony in Wickersham's case offers no such assurances. Likewise, *Shepard* is distinguishable because there the court was assured there was no need to protect the public from further harm.[8]

---

[8] We appreciate Justice Gordon McCloud's compassionate discussion of the tragedy of chronic mental illness and have no disagreement with her assessment of the situation here in that regard. We do not agree, however, that a departure from the Board's unanimous three-year suspension decision is warranted. The concurrence submits that a three-year suspension punishes Wickersham for being mentally ill, contrary to the goals of the attorney discipline system. Concurrence at 5-6. But as our review demonstrates, the Board's sanction here is proportionate, and there is no suggestion that it was predicated on anything other than appropriate concerns for deterrence and protection of the public. Nor are we prepared to order the WSBA to engage in the kind of oversight and monitoring during the suspension period that the concurrence proposes. On this record, we have little information about whether such a framework would be workable for either the WSBA or Wickersham. In sum, while we acknowledge that this case is made all the more challenging by the intersection of chronic mental illness and the disciplinary system, we hew to the standards requiring us to give great weight to a unanimous Board decision. The Board's sanction is proportionate and sustainable on the record before us.

In sum, although this court adds mitigating factors not considered by the Board to the sanction analysis here—in particular the mitigators of remorse and absence of selfish motive—we do not depart from the Board's recommended sanction, which was unanimous and therefore entitled to great weight. Thus, we impose a three-year suspension subject to the same conditions involving Wickersham's fitness to return to practice imposed by the hearing officer and adopted by the Board.

## CONCLUSION

This is a difficult case in that the record suggests that Wickersham continued to experience mental health issues even at the time of his discipline hearing. Our examination of the record reveals troubling instances of insensitivity to Wickersham's condition. For example, the hearing examiner wrote that while Wickersham identified one of his diagnoses as megalomania, "it might better be described as hubris." Hr'g Officer's Decision at 22. This kind of moralizing in the context of mental illness does not further the purposes of the disciplinary process. But the fact remains that Wickersham's condition prevented him from competently practicing law, with potentially serious injury to his clients. Wickersham failed to establish at his hearing that he was ready to return to the practice of law, and this court has no more current information than that. Given the seriousness of the misconduct and after considering appropriate aggravating and mitigating factors, as well as similar cases, we impose a three-year suspension. We further adopt the Board's recommended condition to reinstatement: that Wickersham undergo an

independent examination by a licensed clinical psychologist or psychiatrist chosen by the WSBA, 30 days prior to a request for reinstatement, and execute all necessary releases to permit the evaluator to obtain all necessary treatment records. Further, the evaluator must make a report to the WSBA addressing (1) whether Wickersham has recovered from any issues identified by the evaluator as influencing Wickersham's performance as a lawyer and (2) whether Wickersham's condition is such that he is currently fit to practice law.

_Stephens, J._

WE CONCUR:

_Madsen, C.J._

_J.M. Johnson, J._

_Wiggins, J._

_González, J._

_Fairhurst, J._

No. 201,088-1 (WSBA #18816)

GORDON McCLOUD, J. (dissenting)—Mental health problems require mental health solutions. That is especially important when protection of the public is at stake—and protection of the public is the main goal of attorney discipline.

In this case, Joe Wickersham suffered severe mental illnesses that caused his unprofessional and weird behavior. He suffered from a mood disorder and posttraumatic stress disorder, "very likely major depressive disorder," and possibly "mania, hypomania . . . delusional disorder, and bipolar disorder." Findings of Fact, Conclusions of Law and Hr'g Officer's Recommendation at 18 (Findings of Fact (FF) 93); Clerk's Papers (CP) at 18.[1] Mr. Wickersham also exhibited symptoms of paranoia and testified that he had been treated for megalomania. *Id.* at 19 (FF 93); CP at 19.

---

[1] Experts recognize these and other mental health conditions as forms of "mental illness"—"disorders that affect your mood, thinking and behavior." MAYO CLINIC, MENTAL ILLNESS—DEFINITION, *available at* http://www.mayoclinic.com/health/mental-illness/DS01104 (last visited Oct. 14, 2013).

1

The majority acknowledges that Mr. Wickersham suffered from severe mental health problems related to his violations.[2] The Washington State Bar Association (WSBA) also acknowledged that the violations were mitigated by "the presence of personal or emotional health problems." Majority at 15 (citing Board Order Amending Decision at 5).

Like physical illnesses, these mental illnesses strike without personal blame. A mental illness is "a health condition that changes a person's thinking, feelings, or behavior (or all three) and that causes the person distress and difficulty in functioning."[3] Ongoing research indicates that "mental illness is associated with changes in the brain's structure, chemistry, and function and that mental illness does indeed have a biological basis."[4] Because of this research, scientists have

---

[2] *E.g.*, majority at 16 (WSBA's decision that the most serious violation was "knowing" is "debatable" "[g]iven the extreme nature of the mental health issues Wickersham was experiencing in summer and fall 2010 . . . ."); *id.* ("We could fairly conclude that Wickersham was unaware of the nature or attendant circumstances of his conduct, and thus did not act knowingly. On the contrary, his thought process appears to have been singularly divorced from reality during summer and fall 2010."); *id.* at 20 ("[A]s strongly as the evidence suggests that severe mental health issues gave rise to the conduct at issue, we cannot add the mitigator of mental disability to Wickersham's sanction analysis" because it does not fit strictly within the parameters of the American Bar Association's *Standards for Imposing Lawyer Sanctions.*).

[3] NAT'L INST. OF MENTAL HEALTH, TEACHER'S GUIDE: INFORMATION ABOUT MENTAL ILLNESS AND THE BRAIN § 1, *available at* http://science.education.nih.gov/supplements/nih5/mental/guide/info-mental-a.htm (last visited Oct. 14, 2013).

[4] *Id.*

2

found mental illnesses to be comparable to other brain disorders, such as "epilepsy,
Parkinson's disease, and multiple sclerosis."[5]

Just as epilepsy, Parkinson's disease, and multiple sclerosis can cause a
person's body to act in ways over which he or she has no control, mental illnesses
can cause people to behave or react to situations in a manner contrary to their usual
disposition.[6] In fact, one of the warning signs for mental illness is a "marked
personality change."[7]

In this case, Mr. Wickersham's mental illnesses caused severe problems in
his life, in his practice, and for his clients. I therefore agree with the majority that
we must uphold the WSBA's unanimous finding that he committed six counts of
professional misconduct.

But I cannot agree with the extremely punitive sanction through which the
WSBA and the majority chose to address this misconduct.

The purpose of attorney discipline is to protect the public and deter other
lawyers from misconduct. *In re Disciplinary Proceeding Against Kuvara*, 149
Wn.2d 237, 257, 66 P.3d 1057 (2003) (citing *In re Disciplinary Proceeding
Against Noble*, 100 Wn.2d 88, 95, 667 P.2d 608 (1983)).

---

[5] *Id.*
[6] *Id.* § 3.
[7] *Id.*

The WSBA obviously does not think that Mr. Wickersham currently presents a danger to the public, to clients, or to potential clients. The WSBA did not seek interim suspension pending the outcome of these disciplinary proceedings; it made a decision that he was capable of continuing with his practice in the limited fashion that he was doing so, with his mental illnesses now under some control. Majority at 7 ("The WSBA apparently did not seek an interim suspension.").[8] His emotional problems are certainly not fully under control; as the majority notes, Mr. Wickersham's own mental health expert "opined that [he] was 'improving dramatically' and if he continued with treatment, 'would be able to return to full functioning at some time in the fairly near future.'" *Id.* at 19 (quoting III Verbatim Transcript of Proceedings (Sept. 8, 2011) at 532). But no one argues that he now poses a danger to the public from his current practice.

The WSBA's recommendation that Mr. Wickersham be suspended from practice at the conclusion of these proceedings, despite the lack of danger his continued practice poses right now, for three years—the maximum possible period of suspension that can be imposed, Rules for Enforcement of Lawyer Conduct (ELC) 13.3—must therefore be based on something other than protection of the

---

[8] At oral argument the WSBA confirmed its decision not to seek an interim suspension. Wash. Supreme Court oral argument, *In re Discipline of Wickersham*, No. 201,088-1 (Mar. 12, 2013), at 19 min., 30 sec., *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org.

public. It must be based on a desire to punish him for conduct that was, frankly, inappropriate, obnoxious, disrespectful, and dangerous to his clients and to the criminal justice system.

But protection of the public and deterrence of similar misconduct are the only permissible purposes of attorney discipline in Washington. *Kuvara*, 149 Wn.2d at 257 (citing *Noble*, 100 Wn.2d at 95). Punishment is certainly a permissible goal of the criminal law. But Mr. Wickersham has not been convicted of a crime. And punishment is not the goal of attorney discipline. *In re Disciplinary Proceeding Against Tasker*, 141 Wn.2d 557, 569, 9 P.3d 822 (2000) ("retribution and punishment are not among the purposes of lawyer discipline" (citing *Noble*, 100 Wn.2d at 95)); *In re Discipline Proceeding Against Vetter*, 104 Wn.2d 779, 792, 711 P.2d 284 (1985) ("[T]he purposes of attorney discipline are limited to the protection of the public and to the deterrence of other attorneys from similar misconduct. Punishment is never the goal, but the inevitable sequela of the sanction." (citing *Noble*, 100 Wn.2d at 95)). I therefore respectfully dissent from the majority's decision to endorse this most punitive sanction, rather than to impose a sanction that addresses Mr. Wickersham's mental illness.

In disciplinary proceedings, the Washington State Supreme Court has the "ultimate responsibility" to determine the sanctions for attorney misconduct. *In re*

*Disciplinary Proceeding Against Christopher*, 153 Wn.2d 669, 677, 105 P.3d 976 (2005) (citing *In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 812, 72 P.3d 1067 (2003)). The court generally gives "great deference to the decisions of a unanimous Board," and will "adopt the Board's sanction 'unless [the court is] able to articulate specific reasons for adopting a different sanction.'" *In re Disciplinary Proceeding Against Day*, 162 Wn.2d 527, 538, 173 P.3d 915 (2007) (quoting *Noble,* 100 Wn.2d at 95).

There is a "specific reason[]" for imposing a different sanction in this case. The reason is that we should not punish a person for his or her mental illness. It is not an effective way to deter the individual from slipping under the bell jar.[9] It is not an effective way to deter other lawyers from violating the Rules of Professional Conduct. And it is not a proper or moral response to mental illness. *See Robinson v. California*, 370 U.S. 660, 666, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962) ("a law which made a criminal offense of such a disease [as mental illness] would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments" (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 67 S. Ct. 374, 91 L. Ed. 422 (1947))).

---

[9] Sylvia Plath, THE BELL JAR (1963).

If the public is in current jeopardy from the mentally ill lawyer, then the proper, moral, response—like the effective consumer protection response—is to bar the person from practicing law *now*. That is apparently not the case here—the WSBA decided to permit Mr. Wickersham to continue practicing law during the two years that this disciplinary action has been pending, thus allowing him to return to practice very slowly during his recovery. Where, as here, the public is not currently in jeopardy from the recovering lawyer, the proper response is to create incentives to seek appropriate treatment (e.g., medication, medical assistance, therapy) to avoid relapse.

The disciplinary board's (Board) recommended sanction would protect the public from Mr. Wickersham for the duration of the three-year suspension, but research indicates that mental illnesses are similar to other chronic diseases, in that most require "continuing care and monitoring."[10] Without continued treatment and monitoring, "the outcome is often relapse."[11] The Board's recommended sanction

---

[10] LINDA ROSENBERG, EQUAL TREATMENT: MENTAL ILLNESS IS A CHRONIC DISEASE, NAT'L COUNCIL FOR CMTY. BEHAVIORAL HEALTHCARE, *available at* http://nccbh.browsermedia.com/galleries/press-files/LindaEqualTreatment.pdf (last visited Oct. 14, 2013).
[11] *Id.*

includes no oversight mechanism, and thus no means to ensure that Mr. Wickersham does not suffer a relapse and harm clients while he reenters practice.[12]

A two-year suspension, followed by two years of probation, is a better response to the problems presented in this case. Monitoring Mr. Wickersham for a period of time while he is practicing will ensure that he is receiving proper treatment and is able to fulfill his professional duties. This sanction would acknowledge the fact that Mr. Wickersham's misconduct resulted from personality and behavioral changes related to his illnesses, and it would promote his rehabilitation. The Board's recommended sanction seems to punish Mr. Wickersham for the symptoms his illnesses caused and provides no mechanism for monitoring his treatment and recovery.

I therefore respectfully dissent from the majority's decision to suspend Mr. Wickersham from the practice of law for three years. It is a punitive response to a mental health issue. The public would be better protected by the imposition of a shorter suspension, combined with a very long term of supervision to ensure

---

[12] The Board's sanction, which the majority affirms, requires Mr. Wickersham to undergo an independent examination 30 days prior to a request for reinstatement. Majority at 27; CP at 57, 68. This requirement provides some protection for the public in that it is a screening mechanism, but it does not entail any probationary period during which Mr. Wickersham could be monitored as he readjusts to the demands of his practice. The Board's order provides for the possibility of such supervision because it states that "[t]he Disciplinary Board shall decide under what conditions Respondent shall return to the active practice of law," but it does not make supervision mandatory. CP at 57-58. We would structure the sanction so as to ensure a period of supervision.

compliance with the conditions aptly listed by the majority. This would ensure that if Mr. Wickersham exhibits any future mental health problems, these problems can be minimized, or at least acknowledged, and addressed with curative steps or arrangements to wind down his practice in an orderly fashion. Unfortunately, we do not have the best tools at our disposal to accomplish this. The maximum period of probation currently available is two years. ELC 13.8. The record in this case indicates that two years of probation might not be a sufficient amount of time to protect the public and assure Mr. Wickersham's healthy return to full-time practice. Three years of suspension, however, does nothing to ensure a successful return. I would therefore impose a term of suspension of no longer than two years, to be followed by the maximum two-year term of probation combined with the conditions well-described by the majority.